```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3              CASE NO.:  17-62347-Civ-HUNT

 4                                          ┌─────────────┐
                                            │  ORIGINAL   │
 5   DONNIE CHIKENZIE LEUNG TAT,            └─────────────┘

 6        Plaintiff,

 7   vs.

 8

 9   GARY AMUNDSON, individually,

10   and SCOTT ISRAEL, as SHERIFF of

11   BROWARD COUNTY, Florida,

12        Defendants.

13   _____/

14

15                  DEPOSITION OF

16               ROBERT SCHNAKENBERG

17       TAKEN ON BEHALF OF THE PLAINTIFF

18               AUGUST 28, 2018

19            10:10 a.m. - 11:14 a.m.

20

21

22

23   REPORTED BY:

24   MICHELLE NICHOLS, COURT REPORTER

25   NOTARY PUBLIC, STATE OF FLORIDA
```

```
 1                  INDEX TO APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4          Hugh L. Koerner, Esq.

 5          Hugh L. Koerner, P.A.

 6          Sheridan Executive Centre

 7          3475 Sheridan Street, Suite 208

 8          Hollywood, Florida 33021

 9          (954) 522-1235

10

11   ON BEHALF OF THE DEFENDANTS:

12          Dorsey C. Miller, III

13          Luks, Santaniello, Petrillo & Jones

14          110 S.E. 6th Street, 20th Floor

15          Fort Lauderdale, Florida 33301

16          (954) 761-9900

17

18

19

20

21

22

23

24

25
```

Robert Schnakenberg        August 28, 2018                Page 3

```
 1                    INDEX TO EXAMINATIONS

 2

 3    DIRECT EXAMINATION

 4                                              Page

 5    By Mr. Hugh Koerner, Esq.                  5

 6

 7    CROSS EXAMINATION

 8                                              Page

 9    By Mr. Dorsey Miller, Esq.                 50

10

11    REDIRECT EXAMINATION

12                                              Page

13    By Mr. Hugh Koerner, Esq.                  55

14

15    RECROSS EXAMINATION

16                                              Page

17    By Mr. Dorsey Miller, Esq.                 56

18

19    RE REDIRECT EXAMINATION

20                                              Page

21    By Mr. Hugh Koerner, Esq.                  56

22

23

24

25
```

Verbatim Support Services

| | | |
|---|---|---|
| 1 | INDEX TO EXHIBITS | |
| 2 | NUMBER          DESCRIPTION | PAGE |
| 3 | 1          Photograph | 22 |

```
 1                        DEPOSITION OF

 2                     ROBERT SCHNAKENBERG

 3                       AUGUST 28, 2018

 4

 5                    ROBERT SCHNAKENBERG,

 6       having first been duly sworn, testified as follows:

 7

 8           COURT REPORTER:  We are here today for the

 9       deposition of Robert Schnakenberg.  Today's date is

10       August 28, 2018.  The time is 10:10 a.m.  My name is

11       Michelle Nichols, and I'm the court reporter with

12       Verbatim.

13           Counsel, can you please introduce yourself for

14       the matter for which we are here for the record.

15           MR. KOERNER:  I'm Hugh Koerner on behalf of

16       Plaintiff.

17           MR. MILLER:  Dorsey Miller on behalf of

18       Defendants.

19

20                    DIRECT EXAMINATION

21        BY MR. HUGH KOERNER, ESQ.:

22        Q    Sir, I'm Hugh Koerner.  We're here today for

23    your deposition in a civil action styled Donnie Leung

24    Tat versus Gary Amundson and Scott Israel as sheriff of

25    Broward County.  My understanding is that you're deputy
```

```
 1   sheriff of Broward County Sheriff's Office?

 2        A    Yes, sir.

 3        Q    So my name is Hugh Koerner, again.  This is a

 4   civil action.   I'm assuming since you're a captain with

 5   the sheriff's office -- you're still a captain --

 6        A    Captain, yes.

 7        Q    -- that you've given deposition testimony from

 8   time to time?

 9        A    Yes, I have.

10        Q    So the same rules that typically apply in a

11   criminal action apply here today except for the fact

12   that you're here in a civil matter, the lawyer you're

13   your employer, the sheriff's office, is here and

14   represents you.   So it's a little bit different than a

15   deposition with a public defender since the public

16   defender is not your lawyer.   You actually have a lawyer

17   here.  Mr. Miller represents you, so what you said to

18   him and he said to you is covered by attorney/client

19   privilege, so I'm prefacing my questions by not asking

20   you to disclose anything that you guys have talked

21   about.  Okay?

22        A    Yes, sir.

23        Q    Otherwise, the -- the rules or the principles

24   that apply in a civil deposition are generally the same.

25   Mr. Miller might have objections which he might make
```

```
 1   from time to time.  Unless Mr. Miller instructs you not
 2   to answer a question, which is extremely unlikely,
 3   you're still required to answer.  He's just making an
 4   objection for the record.
 5            I don't think we're going to hopefully be too
 6   long today, but if you need to take a break for either
 7   personal or professional reasons, let us know, we'll be
 8   happy to accommodate you in that regard.  All right.
 9       A    Thank you.
10       Q    Have you spoken -- other than your lawyer, have
11   you spoken to anybody in preparation for your deposition
12   today?
13       A    No, sir.
14       Q    And do you still work with Major Holmes?
15       A    No, sir.
16       Q    Do you still work with Gary Amundson, A-M-U-N-D-
17   S-O-N?
18       A    Well, when you say, "work," in the sheriff's
19   office or under my command?
20       Q    Your command.
21       A    No, sir.
22       Q    What is your command?
23       A    In the City of Deerfield Beach, I'm the captain
24   in charge of the district.
25       Q    So in the sheriff's office hierarchy, is the
```

1    Deerfield district run by a captain or is there somebody

2    that's above your pay grade?

3        A    No, the district itself, the day-to-day

4    operations is run by a captain, and then there's a major

5    above me, and then a lieutenant colonel.

6        Q    Who is the major?

7        A    Right know it's Major Angelo Cedeno.

8        Q    And who is the colonel?

9        A    Jim Polan.

10       Q    If I go to the website, it will be the coronel

11   has the picture up there?

12       A    I've never been on the website, so I can't tell

13   you.

14       Q    Okay.  Fair enough.  Does Deputy Amundson still

15   work in the Deerfield district?

16       A    No, sir.

17       Q    Do you know when he left?

18       A    I don't know exactly, no.

19       Q    So just for the record, since I don't chat with

20   many captains, what is that you do on a day-to-day basis

21   to keep Deerfield running?

22       A    We're -- I'm charge of the entire district,

23   every operation, budget, manpower, vehicles, calls for

24   service.  So I oversee everything that a normal police

25   chief would see, only it's a district in Broward

```
 1  Sheriff's Office.
 2      Q     How long have you been with the sheriff's
 3  office?
 4      A     I started in -- I started as a police officer in
 5  1986 with the City of Deerfield Beach, and in 2000 --
 6  1999, I'm sorry, in 1999 -- uh, wait a minute.  I need
 7  to -- in 1991, they merged with the Broward Sheriff's
 8  Office, and I've been with them since.
 9      Q     Did you work with Mr. Jafreda (phonetic) or is
10  he --
11      A     Yeah, Dick Jafreda, absolutely.  He was my
12  captain.
13      Q     For what it's worth, back in those days when I
14  was a young prosecutor, everyone agreed that Deerfield
15  had a really -- a really good department.
16      A     Oh, thank you.
17      Q     Great report writing.  It was good -- good solid
18  lock-in --
19      A     Well, it's good to hear it.
20      Q     -- going on there.
21      A     Good.  Thank you.
22      Q     Plus Richard Jafreda is a friend of mine, that's
23  his son.
24      A     The son, yeah.
25      Q     So we were contemporaries.  So I knew all about
```

1  it --

2      A     Dick is a good guy.  I see him once every

3  quarter when we sit on the board together.

4      Q     Sounds good.  So did you ever leave Deerfield?

5      A     Yes, I did.  In 2001, I was -- in 2000, I was

6  transferred to the criminal investigations division in

7  the Broward Sheriff's Office, which is Downtown Fort

8  Lauderdale.  And then came back in 2013 as the chief of

9  Deerfield.

10     Q     Can you give me a rundown as to how long you

11 worked on road patrol and where you went next?

12     A     Sure.  From 1986 to 1991, I was on road patrol.

13 In 1991 to about 2001, I was a detective in the criminal

14 investigations division of the Deerfield Beach district.

15 2001, I was promoted to sergeant -- in 2000, I'm sorry.

16 In 2000, I got transferred to downtown sex crimes, and I

17 worked sex crimes for a year, and then in 2001, I was

18 promoted to the rank of sergeant, and I went to the City

19 of Pompano Beach.

20          In 2003, I was promoted to lieutenant and went

21 to unincorporated Fort Lauderdale.  2005, I was promoted

22 to captain, and I took over internal affairs.

23     Q     Did you work with Major Holmes in internal

24 affairs?

25     A     Yes, I did.

1     Q     Was he --

2     A     He was -- he was a sergeant at the time.  He's

3  passed me.

4     Q     Not that there's any great shame in being a

5  captain.

6     A     No.

7     Q     So any prior law enforcement experience before

8  the sheriff's office?

9     A     The City of Deerfield Beach.

10    Q     Any law enforcement experience before the City

11 of Deerfield Beach?

12    A     No.

13    Q     As a captain, your day-to-day responsibilities

14 include engaging in road patrol functions?

15    A     I do.  It's not my role, but I'm a very

16 proactive captain and I write tickets, I make arrests,

17 and I respond to calls, and assist.

18    Q     Can you give us some background as to why it was

19 that you were at the fireworks on July 4, 2014?

20    A     I was the commander in charge of the event.

21 It's a very large event in the City of Deerfield Beach

22 every year where close to 75 to 90,000 people show up.

23 So it's all hands on deck on July 4th.

24    Q     I see.  My understanding is that Major Holmes

25 was there as part of his functions as serving as a

```
 1  liaison between the sheriff's office and the dignitaries
 2  with the City of Deerfield Beach; is that correct?
 3      A    Yeah, he was there as an observer and to show up
 4  -- show the City of Deerfield Beach that, you know,
 5  we're partners.
 6      Q    Were you at the fireworks in your capacity as
 7  the head guy in Deerfield or were you there to perform
 8  essentially road patrol functions?
 9      A    Head guy in Deerfield.
10      Q    Did you have any contact or communication on
11  July 4th with any of the dignitaries from the City of
12  Deerfield Beach?
13      A    I would have, yes, absolutely.
14      Q    Do you know who it was that would have been the
15  dignitaries from the City of Deerfield that attended the
16  fireworks and were in the area where the incident
17  occurred?
18      A    No, sir, not back in 2014, I don't remember who
19  would have been there.
20      Q    Just globally speaking, is it typically people
21  that run parks and recreations or the events people, or
22  is it going to be the commission and the mayor?
23      A    All of the above.  It could have been all of
24  them.  It could have been the mayor, the city manager,
25  directors of certain departments.  I mean, it's a huge
```

```
 1  event.  It's an all-day event, so they come and go.  I
 2  can't tell you exactly who was there though.
 3       Q    So that we know, what is the -- what are the
 4  affairs that occur on the -- on the 4th in terms of
 5  running all day.  I know there's a fireworks display at
 6  night, but you indicating to me it's sort of a bigger
 7  deal.
 8       A    Yeah, it's -- at 12 o'clock there's food trucks,
 9  live bands, rides for kids.  It's a big, huge all-day
10  event.
11       Q    Where are the bands at?
12       A    On the main stage, which is down at Southeast
13  First Street and Southeast Second Street, there's a main
14  parking lot.  They put up a stage.
15       Q    Is that going to be west of --
16       A    It's going to be south of the incident.
17       Q    On the beach, or west of the beach?
18       A    Well, it's on 21st Avenue, which is a road along
19  -- I don't know if you're familiar with Deerfield, but
20  it's a road along the beach.  It's not A1A, it's the one
21  furthest east.
22       Q    And were you in the area of all these events
23  during the day or were you located specifically by the
24  pier?
25       A    No, I was -- I was all over.
```

1    Q    Are you aware of any other arrests that were

2    made on July 4, 2014, other than my client, Mr. Leung

3    Tat -- other than Mr. Sutton?

4    A    I don't remember.

5    Q    Did you prepare any paperwork in conjunction

6    with either the arrest of Mr. Leung Tat or Mr. Sutton?

7    A    No, sir.

8    Q    Do you have any independent recollection of this

9    incident?

10    A    Vaguely, yes.

11    Q    Have you reviewed any paperwork, depositions, of

12    that nature in preparation for your deposition today?

13    A    No, sir.

14    Q    So I have the pier located at 202 Northeast 21st

15    Avenue; is that correct?

16    A    The pier?

17    Q    Right.

18    A    Yes.

19    Q    And if I was standing right at the entrance to

20    the pier, how would I get to the band location?

21    A    You would have to go four blocks right.  You'd

22    have to go south four blocks.  Yeah, four blocks.

23    Q    Do you know what time the fireworks started?

24    A    Normally, they start around 9:05.

25    Q    And who presents the fireworks?

```
 1        A     I don't know the company.

 2        Q     Do you happen to know who owns, I'm going to

 3   show you a photograph that's been marked as a exhibit

 4   for a different deposition, I'm going to show your

 5   lawyer first.  I'm not being rude.  Do you know who owns

 6   this area where these pavers are that form this

 7   boardwalk?

 8        A     The City of Deerfield Beach.

 9        Q     How do you know that?

10        A     Because I've been the chief there for five

11   years, and I know that this is city property along with

12   the pier, and that building there is city owned, but

13   rented out to a contractor for food.  And this what's

14   right above us is the overlook, which the City of

15   Deerfield Beach.

16        Q     And how far east of the boardwalk does the

17   property for the city run until it becomes either

18   Broward County or State of Florida?

19        A     I don't know.

20        Q     Are you aware of any prohibition with regards to

21   smoking on the boardwalk, cigarettes?

22        A     No.

23        Q     Is there -- are there any prohibitions that

24   you're aware of, ordinances, laws, that regulate conduct

25   on the boardwalk specifically?
```

```
 1      A    Well, there's city ordinances that apply to the
 2   entire city, not specific to the boardwalk.
 3      Q    Yeah, I was looking for something specific as
 4   opposed to the ordinances obviously --
 5           MR. MILLER:  Form.  Go ahead and answer if you
 6      can.
 7      A    Well, there's no -- there's no skateboarding, no
 8   bicycles, no dogs, no alcohol.  So --
 9   BY MR. KOERNER:
10      Q    Can you -- right.  Can you -- you can walk your
11   bike, you just can't ride your bike?
12      A    Correct.
13      Q    And do the -- to your knowledge, do these
14   restaurants have any control over the boardwalk?
15           MR. MILLER:  Object to form, but go ahead if you
16      know.
17      A    I don't know.
18   BY MR. KOERNER:
19      Q    How is it that they're allowed to set tables up
20   on the boardwalk?
21      A    They would have to have gotten a permit through
22   the City of Deerfield Beach, I would imagine because
23   that's a City of Deerfield Beach building.
24      Q    Is the boardwalk open to the public?
25      A    Yes.
```

1     Q     Is there any area of the boardwalk that you're

2 aware of that's not open to the public?

3     A     Well, this overhang has a locked gate, so it has

4 to be open to be opened to the public, but generally

5 it's closed, but, yes, you could -- there is -- right

6 where this picture is taken, right here, there's a gate

7 that's locked to get you up to that overlook.  It would

8 have to be open to be available to the general public,

9 but most of the time it's closed.

10     Q     Digressing for a second, do you happen to know

11 approximately the budget -- annual budget for policing

12 in the City of Deerfield Beach?

13     A     Twenty-three million.

14     Q     Approximately, you nailed it.

15          Do you know if the budget for the policing in

16 the City of Deerfield Beach was the same in 2014 as it

17 is today?

18     A     No.

19     Q     Do you know if the City of Deerfield paid more

20 or less than 23 million in 2014?

21     A     Less.

22     Q     Do you know approximately how much?

23     A     It would be in the 20 to 22 range.

24     Q     So 2014, the annual contract between the City of

25 Deerfield Beach and the Broward Sheriff's Office for

```
 1  policing services in the City of Deerfield would have
 2  run between 20 and 22 million dollars annually,
 3  approximately?
 4       A    Approximately, yes.
 5       Q    A little less than two million a month, correct?
 6       A    Yes.  Quick math, yes.
 7       Q    Do you have any recollection of being aware of
 8  my client, Donnie Leung Tat, prior to the time that you
 9  were contacted by Major Holmes concerning some sort of
10  an incident on the ground level of the boardwalk?
11       A    Are you asking if I knew him prior to the
12  incident?
13       Q    Had you seen him on the boardwalk, had you seen
14  him in your daily affairs, did you know him from
15  business or social, anything?
16       A    No, sir.
17       Q    Am I correct that you became aware of an
18  incident on the ground level of the boardwalk because
19  Major Holmes brought the matter to your attention?
20       A    No, that's not true.
21       Q    How is it that you became aware of an incident
22  on the ground level of the boardwalk?
23       A    I was up on the upper deck of the overlook and
24  during the firework display, I could hear yelling down
25  to my right, I looked over to my right, and I could see
```

```
 1  some type of disturbance going on where people were
 2  looking in the general direction of a male and a female
 3  engaged in loud conversation.  I let Major Holmes, who
 4  was to my right, know that there's an issue down there,
 5  and Deputy Amundson was directed to go and investigate.
 6       Q    Who was it that directed Deputy Amundson to go
 7  and investigate?
 8       A    I don't know exactly.
 9       Q    Do you know where --
10       A    It would have been either me or Holmes or
11  somebody.
12       Q    Do you know where Major Holmes is physically
13  located at the time he was directed to go investigate?
14       A    He was up on the upper deck with me.
15       Q    Do you know where on the upper deck Major Holmes
16  is located when you directed him to go investigate?
17            MR. MILLER:  Holmes or Amundson?
18            MR. KOERNER:  I'm sorry.  He's correct.
19  BY MR. KOERNER:
20       Q    Do you know where it was that Deputy Amundson
21  was located prior to the time he was directed by you to
22  go investigate?
23       A    Not exactly.  He would have been in the general
24  area though.
25       Q    Did you ever observe Deputy Amundson on his cell
```

```
 1   phone filming the fireworks prior to the time that you
 2   directed him to go downstairs?
 3       A    No, sir.
 4       Q    For how long a period of time did you view
 5   whatever activities were occurring downstairs prior to
 6   the time that you spoke to either Major Holmes or Deputy
 7   Amundson?
 8       A    I would say probably a matter of seconds.  I
 9   couldn't tell you exactly, but once we observed the
10   disturbance, we needed to go down and investigate before
11   it got into a large brawl.  There was a large crowd in
12   that area, which is typical of 4th of July there.
13       Q    Had there been any brawls on July 4, 2014?
14       A    I can't remember.  We have fights every year,
15   but I can't tell you exactly in 2014 which one it was.
16   Every year there's fights.
17       Q    Can you direct me to any physical violence that
18   occurred on July 4, 2014 with any patrons?
19       A    Again, I don't remember.
20       Q    Did you witness any physical violence in the
21   seconds that you were looking down the stairs?
22       A    No, but I did hear the loud yelling and
23   everybody turning around and looking.
24       Q    How far was it from where you were standing on
25   the second deck to the area where you --
```

1      A     Can I show you on this picture?

2      Q     Yeah.

3      A     They were here, and I'm right -- right here at

4  the edge of this upstairs, so that's probably 20 yards

5  (indicating).

6      Q     Can you use my pen and draw in where it was that

7  the disturbance was located?

8      A     (Complying.)

9      Q     So you drew a circle over one of the orange

10 things?

11     A     Yeah, in front of the tables.

12     Q     And you're indicating that you were on the

13 second deck?

14     A     I'm right over here, yeah (indicating).  I would

15 be over the bushes.  I'd be right over there somewhere.

16     Q     So you're a little bit east?

17     A     Yeah, the overlook -- the overlook goes out, so

18 we would be over here.  It goes further this way, it

19 goes further east towards the water.

20          MR. MILLER:  I just want be clear.  You're on

21      top of this deck?

22          THE WITNESS:  Yes, this is -- this is the bottom

23      of the deck that I'm top of.

24          MR. KOERNER:  Okay.  We'll go ahead and mark

25      that as Plaintiff's Exhibit 1.

```
 1              (Thereupon, Exhibit 1 was entered into the
 2       record.)
 3  BY MR. KOERNER:
 4       Q    All right.  From your distance of 20 yards, were
 5  you able to hear any words that were spoken by anybody?
 6       A    No, sir.  At the time, fireworks were going off,
 7  so it was a lot of noise, a lot of crowd noise as well
 8  because of the fireworks that were going on.  But this
 9  was loud enough that it diverted our attention away from
10  that to hear, but I couldn't tell you what the words
11  were.
12       Q    Can you describe the female?
13       A    No.
14       Q    And was the male that you observed a person that
15  you later came to know to be my client, Mr. Leung Tak?
16       A    To be honest with you, sir, I've never met your
17  client.  I really didn't have any interaction with him.
18  I couldn't even tell you what he looks like to be honest
19  with you.
20       Q    Do you know whether you physically assisted in
21  taking Mr. Leung Tak into custody?
22       A    Yes, I did.
23       Q    Based upon you're physically having taken
24  Mr. Leung Tak into custody, can you describe him for me?
25       A    No.
```

1       Q     Did you or any of your subordinates at the

2   sheriff's office, to your knowledge, ever determine what

3   it was that caused the initial disturbance?

4       A     I would have to read the report.  Independently,

5   I don't exactly remember.

6       Q     Yeah, I mean, Mr. Miller can correct me on this

7   one, but I don't think we've ever been told that anyone

8   got to the bottom of that one, but if you want, I'll let

9   you read all the reports before we end today.  I don't

10  think it's indicated in there as to what caused the

11  initial disturbance.

12      A     Well, I don't have any independent recollection

13  of what caused the disturbance.  I would have to look at

14  the reports.

15      Q     Can you explain to me whether as part of your

16  investigative functions as a police officer it's your

17  responsibility if there's a disturbance to try to find

18  out what precipitated the event?

19      A     Well, unless of course you witness it yourself

20  and you observe the violation of the law, yeah, I mean,

21  you would certainly speak to witnesses.

22      Q     Do you know who it was in your chain of command

23  that was responsible for speaking with any of the

24  witnesses who would have been aware of how the

25  disturbance started?

```
 1        A     Well, it would be the arresting officer.
 2        Q     Is it, at least in your district, incumbent upon
 3   your subordinates to conduct a reasonable investigation
 4   in every instance that that's feasible?
 5        A     I would prefer that.
 6        Q     Are your subordinates required to records the
 7   names in their police reports of witnesses to events?
 8        A     Well, it's discretion on how they write their
 9   reports, and how they formulate their reports, but, you
10   know, you would have to ask him what his policy is and
11   what his method of operation is, but normally, yes, you
12   would try to get as much information as possible to put
13   into a report.
14        Q     Were there other police officers in the area of
15   the pier aside from yourself, Major Holmes, and Deputy
16   Amundson?
17        A     Yes.
18        Q     Do you know if any of those individuals were
19   responding to anything else that was occurring at the
20   same time that would have prevented them from assisting
21   with getting names and phone numbers of witnesses?
22        A     Fourth of July, like I said earlier, there's
23   probably 75 to 90,000 people, sometimes even over 90,000
24   depending on the weather, so we have probably about 75
25   officers spread out along that entire area to observe
```

```
 1   the crowd and for public safety, so is there other

 2   officers there, absolutely, but they also have 75,000

 3   people that they have to keep their eyes on, so I don't

 4   know how many would have come over to assist or if

 5   anybody did assist, but there are a lot of officers down

 6   there.

 7        Q     How many?

 8        A     Like I said, about 75, sometimes 50 to 75,

 9   depending on how many we can get.

10        Q     How many of them were actually located near the

11   pier and not, you know, a mile away?

12        A     Well, it's not a mile.  We go from Northeast 2nd

13   Street -- about Northeast 4th Street, we go down to

14   Southeast 4th Street, so it's like a 10-block area, so

15   we have them all throughout there.

16        Q     Did you ever observe any of your deputies

17   actually go to the -- the table and speak with any of

18   the individuals that were involved in the disturbance?

19        A     No, I didn't.

20        Q     Are you aware of Deputy Amundson ever responding

21   to the area of the table to speak with any individuals

22   who were involved in the disturbance?

23        A     Well, I know that Deputy Amundson went over to

24   that.  I don't know what was said or what he did or what

25   transpired.  I only witnessed what happened afterwards.
```

```
 1      Q     How long was it that Deputy Amundson was at the
 2 table where the disturbance was located?
 3      A     I don't know.
 4      Q     Why do you not know?
 5      A     Because I wasn't watching him the whole time.
 6      Q     Just for backing up a little bit.  You're on the
 7 deck, you watch the disturbance for seconds, you don't
 8 know how long, you can't hear what's being said, but
 9 there's loud voices, the area is crowded, correct?
10      A     Right.
11      Q     Fireworks are going off, boom, boom, boom, at
12 the same time, correct?
13      A     Mm-hmm.
14      Q     "Yes"?
15      A     Yes.  I'm sorry.
16      Q     You direct Deputy Amundson to go downstairs and
17 handle the situation?
18      A     I don't remember if it was me, but he was
19 directed to go down there, yeah.  I don't remember if it
20 was me or if it was somebody else.
21      Q     Did you -- did you speak with Major Holmes prior
22 to the time Deputy Amundson went downstairs?
23      A     Speak to him about what?
24      Q     Anything.
25      A     Yeah, of course.
```

```
 1       Q       Did you speak to Major Holmes concerning the
 2  disturbance prior to --
 3       A       Oh, oh, no.   No.
 4       Q       So prior to Deputy Amundson being directed to go
 5  downstairs by you, there is to your knowledge no
 6  discussion between yourself and Major Holmes anything
 7  related to the disturbance?
 8       A       Not that I remember, no.
 9       Q       And obviously at some point, you go downstairs
10  from the deck to the boardwalk area, correct?
11       A       Yes.
12       Q       Can you tell me how long it was between the time
13  that Deputy Amundson left to go downstairs that you
14  started to move towards the boardwalk yourself?
15       A       Probably a couple of minutes.
16       Q       Can you describe for me what it was that you did
17  during the couple of minutes between the time that
18  Deputy Amundson went downstairs and the time that you
19  actually went down to the boardwalk?
20       A       Sure.  I watched the crowd.
21       Q       Can you provide us with any additional insight
22  or information relating to what happened in the area of
23  the disturbance between the few minutes when Deputy
24  Amundson goes downstairs and you go downstairs?
25       A       No, sir.
```

```
 1      Q     So to the extent that you were watching the
 2  crowd, am I correct that there was nothing about the
 3  area of the disturbance that came to your attention?
 4      A     Well, other than the disturbance itself, and I
 5  was watching the crowd because we had a --everybody
 6  started to turn and look at that direction, so I wanted
 7  to observe the crowd for my officers' safety and along
 8  with our patrons' safety to make sure that there was no
 9  other incidence occurring in that general area.
10      Q     Can you describe for me, if you actually saw
11  Deputy Amundson moving threw the crowd towards the area
12  of the tables?
13      A     Yes.
14      Q     Can you -- can you give me the -- the pace that
15  he was moving at?
16      A     He was walking.
17      Q     Did you watch Deputy Amundson go all the way to
18  the table --
19      A     No.
20      Q     -- where the disturbance was?
21      A     No.
22      Q     Did you see Deputy Amundson speaking to anybody
23  at the table?
24      A     I saw him speaking in the -- I saw -- I couldn't
25  tell you if he was speaking, but I saw him in that area,
```

```
 1   yes.
 2       Q     And do you know how long Deputy Amundson was in
 3   the area of the table?
 4       A     Again, a couple of minutes.
 5       Q     Did you ever see Deputy Amundson write down
 6   anything, any information that you're aware of?
 7       A     Not from my vantage point, no.
 8       Q     Am I correct that you're not going to be able to
 9   give me any more color as to who was at the table,
10   males, females --
11       A     Yeah.
12       Q     -- any descriptions?
13       A     There's hundreds, when I tell you, it's wall-to-
14   wall people all the way from that pier, all the way down
15   to 4th Street, all the way down to the water.  It's --
16   it's like -- you can barely see the sand.  That's how
17   many people are here.  There's 100,000 -- 90 hundred --
18   75 to 100,000 depending on the weather in an eight-block
19   area.  It's a lot of people, so I can't tell you
20   descriptions, people, names, I couldn't tell you that.
21   No, sir.
22       Q     Were you aware at some point of Deputy Amundson
23   leaving the table or the area of the table?
24       A     Yes.
25       Q     Did you have a visual on Deputy Amundson the
```

1    entire time he was at the table?

2    A    No.  Because from my vantage point, there is a

3    load of people, so he was blocked by other people.  When

4    I re-engaged Deputy Amundson, I saw him engaged with the

5    arrestee, and that's when I went downstairs.

6    Q    When you say, "engaged," can you give me a

7    little more color --

8    A    Sure.

9    Q    -- as to what that means?

10   A    Sure.  They had hands on each other.  He was

11   pushing him backwards away from that area, in which time

12   I ran down there because obviously I knew at that point

13   that he was engaged, and he was probably going to take

14   this guy into custody and he was resisting, so I ran

15   downstairs to help him.

16   Q    Did you recognize the person that Deputy

17   Amundson was engaged with from the disturbance that you

18   observed or was it unclear to you who it was he was with

19   or at with?

20   A    No, sir, I couldn't tell you.

21   Q    Did you ever get Deputy Amundson's side of the

22   story as to what happened?

23   A    Well, I did speak to him, yes.

24   Q    Do you have any recollection what Deputy

25   Amundson said had happened?

1    A    That he -- I don't remember exactly, but

2    paraphrasing, I believe that he refused to leave, and he

3    was told he had to leave and he refused and then he was

4    under arrest and then started resisting.

5    Q    Are deputies under your supervision required to

6    follow the requirements of Florida Statute 901.17?

7         MR. MILLER:  Objection to form.  You can answer

8         if you know.

9    A    Regarding what?

10   BY MR. KOERNER:

11   Q    In misdemeanor cases without a warrant advising

12   people that they're being placed under arrest and your

13   authority for the arrest prior to the AG in making the

14   arrest?

15   A    Well, it all depends on the elevation of the

16   situation where sometimes you don't have the ability to

17   speak because you're taking action because your safety

18   is in danger, but at some point, they're told of what

19   they're being charged with.

20   Q    Because 901.17 says, "A peace officer making an

21   arrest without a warrant shall inform the person to be

22   arrested of the officer's authority and the cause of

23   arrest except when a person flees or forcibly resists

24   before the officer has an opportunity to inform the

25   person or when giving the information will imperil the

1   arrest."  Are you familiar with that?

2       A     Yes.

3       Q     Are you aware of whether Deputy Amundson ever

4   advised Mr. Leung Tat of any requirements provided in

5   91.17 before he went hands on?

6       A     I do not.

7       Q     Did you understand in 2014, as you understand

8   now, the purpose of 901.17 is to not surprise people by

9   just grabbing them and trying to handcuff them in

10  misdemeanor cases where there may be circumstances that

11  they're not fully aware of why it is they're being

12  grabbed?

13          MR. MILLER:  Object to form.  Assumes facts not

14      in evidence.  Go ahead.

15      A     Yeah, I didn't write the law, and I don't know

16  what the intent was, but not every -- every arrest

17  that's made fits that black and white.

18  BY MR. KOERNER:

19      Q     I understand, but do you teach the statute to

20  your subordinates?

21      A     I do not teach them, no.

22      Q     Are you aware of whether your subordinates are

23  obligated to follow the requirements of Florida law

24  including 901.17

25      A     Well, of course they are.

1     Q     And your testimony as a captain is you do not

2  understand the purpose of 901.17 in the Florida

3  statutes, correct?

4           MR. MILLER:  Object to form.

5     A     Well, I don't know what the intent was when it

6  was written, no.

7  BY MR. KOERNER:

8     Q     Have you, to your knowledge, ever received any

9  instruction in your department as to what it was that

10 901.17 was intended to do and prevent?

11    A     No, I'm not.

12    Q     Did you ever receive an explanation as to what

13 it was that caused Deputy Amundson to go hands on with

14 Mr. Leung Tat initially?

15    A     No, because, again, my responsibility was crowd

16 control, and overseeing the entire operation, so once

17 your client was taken into custody and everything else

18 stopped, I went back upstairs.

19    Q     Are you aware of whether the Broward Sheriff's

20 Office has the ability to trespass warn persons from the

21 boardwalk?

22    A     Yes.

23    Q     If in fact you wished to have somebody leave the

24 boardwalk and determine that a trespass warning is

25 appropriate, is that warning recorded in any sort of a

1  document or report?

2      A    Yes.  We have signs posted and the City of

3  Deerfield Beach has given us the authority to warn

4  anybody on city property of trespassing.

5      Q    And to your knowledge, did Deputy Amundson ever

6  advise Mr. Leung Tat that he was considered a threat to

7  the safety or security of persons in the area of the

8  boardwalk?

9      A    No, sir I'm not.

10     Q    Do you know under Florida law whether you can

11 arrest persons for trespassing under circumstances where

12 you've been authorized by a city or somebody else to

13 issue warnings in the absence of a threat to public

14 safety or security?

15     A    Well, depends on what we're talking about.  I

16 mean, if they're violating city ordinances or if they're

17 loitering, then, yeah, they can be arrested.  It doesn't

18 mean public safety.  But if they have a open container

19 in front of a store that has a trespass affidavit, then,

20 yeah, they could be arrested for trespassing if they

21 refuse to leave.

22     Q    So I'm looking at Florida Statute 810.09,

23 trespass on property other than structure or conveyance.

24 Are you familiar with that statute?

25     A    I would have to -- I mean, I know the statute,

1   but I don't know it verbatim.

2       Q     Are you familiar with that portion of the

3   Florida statutes that deals with authorized persons such

4   as law enforcement officers who receive written

5   authorization by the owner or his or her agent to

6   communicate an order to leave property?

7       A     Yes.

8       Q     Are you familiar with the fact that under

9   Florida law, the authorized person, such as a law

10  enforcement officer is permitted to exercise that power

11  only in the event of a threat to public safety or

12  welfare?

13          MR. MILLER:  Form.  Go ahead.

14      A     Sure.

15  BY MR. KOERNER:

16      A     So you agree with me if Mr. Leung Tat had done

17  something that was a threat to the public safety or

18  welfare, a police officer has the authority to approach

19  that person, advise them of their authority under the

20  law, and indicate to them that they're being trespassed

21  warned from the boardwalk, and that they have to leave

22  and if they do not leave that they'll be subject to

23  arrest for trespassing?

24      A     Yes.

25      Q     Are you aware of Deputy Amundson ever

```
 1  administering a trespass warning to Mr. Leung Tat before
 2  going hands on?
 3      A    I am not.
 4      Q    If someone is being directed to leave the
 5  boardwalk, is the appropriate tact before you go hands
 6  on to issue that person a trespass warning?
 7      A    Well, if you would make indication that they
 8  need to leave the area or if they refuse to they could
 9  be arrested for trespassing, yes, I don't know -- but
10  that's what I would do.  I don't know what every other
11  officer does.  I can only speak on what I would do.
12      Q    Well, a person is not required to leave public
13  property unless they've been duly warned pursuant to a
14  lawful trespass warning, correct?
15          MR. MILLER:  Form.  Go ahead.
16      A    Yes, they would have to be asked to leave by the
17  law enforcement officer, and if they refused, then they
18  could be arrested for trespassing.
19  BY MR. KOERNER:
20      Q    Does the person have the right to know the
21  things you've just described to me that they're being
22  asked to leave, that you have the authority to ask them
23  to leave, and if they refuse to leave they're subject to
24  arrest?
25      A    Do they have the right to know?  I mean, I'm
```

```
 1   sure they do, but it all depends on every specific
 2   situation.  You may not have the opportunity to explain
 3   all that because it got unsafe quickly, so your -- your
 4   level of whether or not you're going to make an arrest
 5   now or later would be greatly increased if there's any
 6   tension.  So it's an officer safety issue.
 7          I'm not going to sit here and -- or an officer
 8   is not going to sit here and read everything when all of
 9   a sudden, he's being threatened by the person he's
10   standing in front of.
11      Q    Well, if you're a police officer and you're
12   being threatened by someone, that's considered an
13   assault and you can --
14      A    No, not an actual threat, a perceived threat.
15      Q    All right.  Well, you have the ability then if
16   you're perceiving the threat to call for backup if you'd
17   like, correct?
18      A    Yes.
19      Q    Your deputies are equipped with police radios to
20   request assistance, correct?
21      A    Right.
22      Q    I mean, there were deputies, such as yourself,
23   within 20 yards or so, correct?
24      A    Mm-hmm.  Yes.
25      Q    Is that "Yes"?
```

1          Did Deputy Amundson ever get on his radio and

2     indicate that he required back up?

3          A     No, not that I remember.

4          Q     Had Deputy Amundson gotten on his radio and

5     requested backup, am I correct that you would have

6     gladly responded?

7          A     Absolutely.

8          Q     What is it, if you know, that would have given

9     Deputy Amundson the -- the legal authority to touch

10    Mr. Leung Tat?

11         A     Well, if we're going to make an arrest, we have

12    the authority to take them into custody, which means

13    touch.

14         Q     Is there any other basis, that you're aware of,

15    that would allow Deputy Amundson to touch Mr. Leung Tat

16    under the circumstances that you're describing other

17    than to facilitate a lawful arrest?

18         A     In the performance of his duties, yes.

19         Q     Is it the practice of your subordinates to

20    simply walk up to people and grab them by the arm absent

21    an intention to place them under arrest?

22               MR. MILLER:  Object to form.  Assumes facts not

23         in evidence.  Go ahead.

24         A     Again, every situation is different, and

25    depending on circumstances and what his perception is at

```
 1   the time causes him to take action on what he sees fit.
 2   BY MR. KOERNER:
 3       Q.   Can you explain to me what legal basis a police
 4   officer would have to simply walk up to someone and grab
 5   them by the arm?
 6             MR. MILLER:  Same objection.  Go ahead.
 7       A    It depends on what he observed as he's walking
 8   up.  If I see somebody who has a gun in their hand, I'm
 9   grabbing their arm.  If I see him getting ready to punch
10   somebody, I'm grabbing the arm, I'm trying to protect
11   the peace and tranquility of the city of the people in
12   the area and prevent violence.  So I mean I could grab
13   somebody if I perceive that they're going to commit a
14   crime, I don't have to tell them, hey, I'm going to grab
15   your arm or -- there's many different circumstances as
16   to how we could grab somebody.
17   BY MR. KOERNER:
18       Q    So you're suggesting that there could be exigent
19   circumstances that compel a police officer to act
20   immediately without delay?
21       A    Right.  Exactly.
22       Q    In the absence of an exigency requires a police
23   officer to act immediately without delay, am I correct
24   that it's not your practice or the practice of your
25   subordinates to simply walk up to people and grab them
```

1  by the bicep?

2      A      Correct.

3      Q      Absent your intention to want to place them

4  under arrest?

5          MR. MILLER:  Same objection.  Go ahead.

6      A      Absolutely, or prevent a disturbance or to

7  dispel the fear that the people in the area to -- yeah,

8  absolutely.

9  BY MR. KOERNER:

10     Q      Well, preventing a disturbance would have to

11 fall within the realm of some sort of exigency, correct?

12     A      Well, again, depending on what the officer at

13 the time is observing and what action he takes is his

14 perception and his training and his method of operating.

15 So if there's two people that are face to face fighting

16 and screaming and yelling and an officer comes in there

17 to separate them, he's going to have to touch them.

18 He's going to have to separate them.  And you separate

19 them so that they're not able to hurt each other.

20     Q      Two people engaged in a fight or about to engage

21 in a fight would create and exigent circumstance which

22 would allow your officers to go hands on --

23     A      I would believe so, yes.

24     Q      Do you know, through your own personal

25 knowledge, where it was Mr. Leung Tat was physically

1  located at the time that Deputy Amundson encountered him

2  for the first time?

3       A    Well, I believe in that general area because

4  that's where the disturbance where.  I pointed Exhibit 1

5  -- if you got Exhibit 1, in this circle there, right

6  around here, in front of those tables.  Exactly where in

7  front of those tables, I can't tell you, but it was

8  definitely in front of the tables.

9       Q    Am I  correct that this was not a circumstance

10 where Mr. Leung Tat had walked away across the boardwalk

11 prior to the time that he was contacted by Deputy

12 Amundson?

13      A    I can't tell you that.

14      Q    And am I correct this was not a circumstance

15 where you had to point out where Mr. Leung Tat was to

16 Deputy Amundson so that he could speak with him?

17      A    No, I did not.

18      Q    At the time that you observed Mr. Leung Tat and

19 Deputy Amundson, I think you're describing the

20 circumstances where they're holding each other?

21      A    Yes.  Struggling.

22      Q    Holding each other by where?

23      A    It kind of looked like, you know, two linemen in

24 practice, where they're up against each other trying to

25 push each other back.

1     Q      Who was facing you, if anyone?

2     A      Amundson was facing me.

3     Q      So Mr. Leung Tat had had his back to you?

4     A      Yes.

5     Q      And the closest exit would have been to the back

6   of Deputy Amundson, correct?

7     A      Closest exit to what?

8     Q      Off the pier.  Off the boardwalk.

9     A      There's an exit here.  There's an exit here.

10   You can go east.  And there's an exit here.

11    Q      The closest exit to where Deputy Amundson was

12   located would have been to his back as you observed him

13   with Mr. Leung Tat?

14    A      No, there's an exit right here.  This shadow,

15   there's an exit that goes right out here, so you would

16   have to check the distance.  I mean they look -- they

17   look equal distant.

18    Q      Okay.  My understanding, from what you're

19   suggesting is that the umbrellas that you've circled is

20   close to the corner of the building, correct?

21    A      No.  No, I said they were in front of these

22   umbrellas.  See there's one here, there's what four

23   right here.  The one is closest to the -- this fourth

24   one down here is closest to the exit on this side, but

25   this one is closest to the exit on this side.

```
1        Q      Okay.   The one that you circled would be the
2   umbrella down at the far end?
3        A      No, see I circled all of them.
4        Q      Okay.   Whatever it was, the umbrella was 20
5   yards away from where you were?
6        A      Yes.
7        Q      Did you hear Deputy Amundson issue any verbal
8   commands?
9        A      No, sir.
10       Q      Did you hear any words spoken by Mr. Leung Tat
11  at any point during the time he was in contact with
12  Deputy Amundson?
13       A      No, sir.
14       Q      Did you ever speak to Mr. Leon Tat?
15       A      No, sir.
16       Q      Did you make any observations of either Deputy
17  Amundson or Mr. Leung Tat prior to the time that you
18  engaged yourself in this situation that you have not
19  disclosed to me so far here today?
20       A      No, sir.
21       Q      Did you -- at the time, did you see Mr. Leung
22  Tat and Deputy Amundson hands on with each other like
23  two linemen, go downstairs to the first floor, the
24  boardwalk?
25       A      Are you saying is that when I went?
```

```
 1        Q      Yes, sir.

 2        A      Yes, sir.

 3        Q      Between the time that you observed Mr. Leung Tat

 4   and Deputy Amundson with their hands on each other like

 5   a lineman, football lineman --

 6        A      Right.

 7        Q      -- did the time that you re-acquired visual

 8   contact with them, were they in the same or similar

 9   position?

10        A      Yes.  When I went back -- when I went

11   downstairs, Amundson was pushing him backwards and he

12   was resisting.  That's when we took him into custody.

13        Q      Which way was he pushed?

14        A      Going towards the exit on this one.

15        Q      Closer to the --

16        A      The over --

17        Q      -- over --

18        A      Yes, sir.

19        Q      How far had Deputy Amundson pushed Mr. Leung

20   Tat?

21        A      I don't know when they initially engaged exactly

22   where, but we were right here.  Everything happened

23   right here in this general area under the overhang, the

24   beginning of the overhang, so we were right in this

25   area.  If you want, I can circle --
```

```
1      Q     That's all right.
2            From the time that you observed Deputy Amundson
3   and Mr. Leung Tat to the time that you get downstairs
4   and re-acquire visual contact with him, Deputy Amundson
5   and Mr. Leon Tat are now essentially in the area under
6   or near the overhang for the second story?
7      A     Yeah, I can't say they're exactly under the
8   overhang, but they're in this general area between this
9   palm tree and right this overhang.
10     Q     So they moved 15 or 20 yards?
11     A     Probably about -- depending on if it was engaged
12  here, probably about 10 yards.  If it's down here, about
13  20 yards.
14     Q     And was it still a situation where Deputy
15  Amundson and Mr. Leung Tat were engaged like lineman
16  when you got downstairs?
17     A     They were both still standing, yes.
18     Q     And was Deputy Amundson still essentially facing
19  the overhang and Mr. Leung Tat still had his back to
20  where you were when you came downstairs?
21     A     Correct.
22     Q     And what, if any, action did you take once you
23  got downstairs?
24     A     I assisted Gary taking Mr. Tat to the ground and
25  handcuffing him, and then at that time, I maintained
```

1    Mr. Tat on the ground while a second individual is being

2    arrested for battery on Major Holmes.

3         Q    Had did you assist Deputy Amundson in securing

4    Mr. Leung Tat?

5         A    By taking him to the ground.

6         Q    Had did you get Mr. Leung Tat to the ground?

7         A    I don't remember exactly, but we took him to the

8    ground.  I don't remember if it was a leg sweep or just

9    we both drove him to the ground.  I don't remember how

10   we did it.

11        Q    Did you use any force towards Mr. Leung Tat?

12        A    Other than to secure him in handcuffs, no.

13        Q    So you weren't involved in any kind of leg sweep

14   or anything like that?

15        A    I don't remember how we got him to the ground to

16   be honest with you, but we took him to the ground.

17        Q    If you used force towards Mr. Leung Tat, would

18   you be required pursuant to Broward Sheriff's Office

19   policy and procedures to complete a report?

20        A    It depends on the level of force.  Back in --

21   the policy in 2014 is a little different than it is

22   today.

23        Q    Seems like it changes every year.  So --

24        A    Well, so does society.

25        Q    I don't know in 2014 whether you were required

1   to complete a separate use of force report, whether you

2   could incorporate the information in a supplement report

3   or event report or whether your subordinates could do it

4   for you, but globally speaking, if you use force, is

5   that supposed to be documented?

6            MR. MILLER:  Object to form.

7       A     In 2014, unless there was injuries, it wouldn't

8   have been a separate form.  If there's injuries, then

9   there was a separate form.  Now, there doesn't have to

10  be injuries for use of force.  There just has to be some

11  type of manipulation.  So it's changed.

12  BY MR. KOERNER:

13      Q     So am I correct that in 2014, you were not

14  required to document any use of force towards Mr. Leung

15  Tat if in fact you used any forced?

16      A     Unless there's injuries.

17      Q     Am I correct that in the absence of any injuries

18  in 2014, you would have not been required to complete a

19  use of force report?

20      A     Correct.

21      Q     Am I correct that even in the absence of

22  injuries in 2018, you are required to complete a use of

23  force report?

24      A     Correct.

25      Q     So if you did use any force towards Mr. Leung

1    Tat, to your knowledge, that information would be not

2    reported?

3        A    Correct, but in 2014, a leg sweep or a takedown

4    was not considered use of force.  It was considered a

5    lawful arrest.  Today, it's considered use of force

6    because you manipulated or guided an individual to the

7    ground, so we have to do use of force, but back then it

8    wasn't.

9        Q    Who handcuffed Mr. Leung Tat?

10       A    I believe Deputy Amundson.

11       Q    Can you describe for me anything that occurred

12   between the time that you came downstairs and the time

13   that Mr. Leung Tat went to the ground?

14       A    Other than the pushing each other?

15       Q    Still the same thing, pushing --

16       A    Yeah.  Yeah.

17       Q    Was Mr. Leung Tat still being pushed back by

18   Deputy Amundson?

19       A    Yes.

20       Q    And can you describe for me anything that

21   occurred on the ground?

22       A    No.  Other than him being placed in handcuffs.

23       Q    Did you ever observe Mr. Leung Tat hit or punch

24   or strike any deputy?

25       A    No.  Well, he grabbed at Deputy Amundson, but I

1    didn't see anything prior to that, but when I saw them,

2    they were locked up.

3        Q    Am I correct that you never saw Mr. Leung Tat

4    hit or strike any deputy?

5        A    Well, again, his hands were on Deputy Amundson,

6    so he's touching an individual.

7        Q    You observed Mr. Leung Tat touching Deputy

8    Amundson?

9        A    Absolutely.

10       Q    Am I correct that aside from Mr. Leung Tat

11   touching Deputy Amundson, you never observed Mr. Leung

12   Tat hit or strike any deputy?

13       A    No.

14       Q    And after Mr. Leung Tat is placed in handcuffs,

15   do you then remove yourself from any involvement, go

16   back upstairs to the second floor?

17       A    Yes.

18       Q    And would the next time that you became aware of

19   anything involved in this incident have been Mr.

20   Miller's office contacted you?

21       A    That is correct.

22       Q    Is there anything that you observed with regard

23   to this incident that you've not disclosed to me so far

24   here today?

25       A    No, sir.

1    Q    Is there anything that you've heard from either

2    Deputy Amundson or Mr. Leung Tat or Major Holmes that

3    you have not disclosed to me so far today?

4    A    No, sir.

5    Q    Did you have any contact with Jonathan Sutton?

6    A    No.

7         MR. KOERNER:  I have -- I have nothing further.

8    It's possible Mr. Miller wants to question.

9         MR. MILLER:  I just have a few follow-ups for

10   you.

11                   CROSS EXAMINATION

12   BY MR. DORSEY MILLER, ESQ.:

13   Q    And I want to be clear, when Mr. Tat is first

14   approached by Deputy Amundson, you're still upstairs,

15   correct?

16   A    Yes, sir.

17   Q    You've already explained that it was loud and

18   noisy on the pier, correct?

19   A    Yes, sir.

20   Q    Even as Mr. Tat and these individuals he's

21   arguing with are yelling at each other, you couldn't

22   have made out what they were saying because of the

23   noise, correct?

24   A    Correct.

25   Q    Okay.  So in terms of anything Deputy Amundson

```
 1   may have said to Mr. Tat before they begin grabbing at
 2   each other as you described, you wouldn't have been able
 3   to hear that from your vantage point, correct?
 4        A    Correct.
 5        Q    So, for example, if he asked the plaintiff to
 6   step out of the crowd so they could talk, you would be
 7   able to hear that, correct?
 8        A    Correct.
 9        Q    Okay.  If he asked -- or if he gave any other
10   type of commands to Mr. Tat before he first approached
11   him, you wouldn't have been able to hear that from your
12   vantage point, correct?
13        A    That's correct.
14        Q    Okay.  Not saying there were not conversations,
15   there were no commands, there were no requests made by
16   Deputy Amundson, you're saying because if there were you
17   couldn't hear what they were saying, correct?
18        A    That is correct.
19        Q    And I would also like to clarify something.  You
20   were asked whether you spoke to Major Holmes before
21   Deputy Amundson was directed to go downstairs, right?
22   You remember that?
23        A    Yes.
24        Q    Okay.  I believe you said some time ago that you
25   didn't speak to Deputy Holmes, but isn't it correct that
```

1  earlier in the deposition you said that once you saw the
2  disturbance you had mentioned to Deputy Holmes, correct?
3      A     Well, he was standing next to me, and I put the
4  flashlight on there, so I mean, I'm sure he observed the
5  same thing I observed.  I don't remember if we had any
6  conversation, but he was literally standing right to my
7  right.
8      Q     Major Holmes, that is, right?
9      A     Major Holmes, yes.
10     Q     In other words, you don't recall having a
11 detailed discussion about it, but you did mention that
12 you saw something?
13     A     Right, well, I said, hey, we got something going
14 on.  I mean, if that's a conversation, then, yeah, I
15 guess I misspoke, then I had a conversation, but it
16 wasn't -- it was comment in a flashlight to the area.
17     Q     And I also want to clarify something else.  You
18 mentioned that as you visualize what is happening
19 downstairs between Mr. Tat and these people he's arguing
20 with, other people are looking, is there a crowd
21 beginning to gather?
22     A     Well, there was a crowd already, but what
23 happened was everybody starting turning to the
24 disturbance, so you could tell exactly where it was
25 occurring.  You could hear it.  You could see it.  And

```
 1   you could judge by the crowd in what direction it was

 2   coming from, because they all turned their heads and

 3   were looking at the issue.

 4       Q    And you said there were several thousand people

 5   on the beach that night, correct?

 6       A    Over 75,000.

 7       Q    So a situation like what you were observing from

 8   up on the deck is a potentially dangerous situation;

 9   would you agree with that?

10       A    Absolutely.

11       Q    Is that the whole reason you sent Deputy

12   Amundson down there in the first place?

13       A    Absolutely.

14       Q    Whether it was you or Major Holmes or whoever?

15       A    It could easily turn into a melee.

16       Q    So that is potentially a reasonable treat to

17   public safety what you're witnessing, right?

18       A    Oh, absolutely.

19       Q    Also I want you about Deputy Amundson calling

20   for backup.  You had already witnessed this situation

21   with Mr. Tat and Deputy Amundson are grabbing onto each

22   other, correct?

23       A    Correct.

24       Q    Okay.  And once you see that, you go downstairs

25   immediately?
```

Case 0:17-cv-62347-PMH   Document 58-2   Entered on FLSD Docket 10/05/2018   Page 54 of 80

Robert Schnakenberg        August 28, 2018              Page 54

```
 1     A     That's a -- yeah, that's a sign that I need to
 2  get down there for backup.
 3     Q     Okay.  So even though he didn't call you, you
 4  were there anyway, correct?
 5     A     Of course.
 6     Q     And if he perceived a threat, would you agree
 7  with me that it might not be practical for him to pick
 8  up his radio and say, hey, I need backup?
 9     A     It would be unsafe for him to do so.
10     Q     And also want to be clear, when you see Deputy
11  Amundson at the table, there's a period of time that I
12  guess you can't see him because your view is blocked,
13  the next time you see him he's already engaged with
14  Mr.  Tat, correct?
15     A     Yes.
16     Q     Okay.  I just want to be clear.  It was not your
17  testimony that Deputy Amundson simply walked up to
18  Mr. Tat and grabbed his arm for no reason, correct?
19     A     I never said that.
20     Q     You're saying you didn't see that initial --
21  that initial contact with Amundson and Leung, correct?
22     A     Correct.
23     Q     Okay.  You would rely on Deputy Amundson to tell
24  us what happened in the situation, right?
25     A     I'm sorry.  Say that again?
```

Verbatim Support Services

1      Q      You would rely on Deputy Amundson to tell us

2  what happened in the moment he approached Mr. Tat,

3  right?

4      A      Tell who?

5      Q      To tell us, tell anybody because he's the one

6  that went down there, right?

7      A      Right.

8             MR. MILLER:  I don't have anything else.

9                    REDIRECT EXAMINATION

10    BY MR. HUGH KOERNER, ESQ.:

11     Q      Would you agree, sir, that no person in the City

12 of Deerfield has the right to slap or strike Mr. Leung

13 Tat if he -- they perceive him wanting to smoke a

14 cigarette on the boardwalk?

15            MR. MILLER:  Object to scope, but go ahead.

16     A      I would say no.

17 BY MR. KOERNER:

18     Q      Would you agree with me that it's your

19 responsibility as a police department and part of your

20 policing function is to ascertain why it is that people

21 are engaged in disturbances?

22            MR. MILLER:  Form.  Asked and answered.

23     A      That would be part of the investigation.

24            MR. KOERNER:  That's all I have.  Thanks for you

25     time today, and it's nice to meet you.

```
 1              THE WITNESS:  You too, sir.

 2              COURT REPORTER:  Would you like to --

 3              MR. KOERNER:  I'm sorry.  He'll read, right?

 4              MR. MILLER: Yeah, but I got a quick follow-up.

 5              MR. KOERNER:  You can just do an affidavit if

 6      you'd like.

 7              MR. MILLER:  This will be quick.

 8                      RECROSS EXAMINATION

 9      BY MR. DORSEY MILLER, ESQ.:

10      Q    Did you ever see anybody slap Mr. Tat that

11  night?

12      A    No.

13      Q    To your knowledge, did he ever tell BSO he was

14  slapped that night?

15      A    I have no knowledge.

16      Q    Not to your knowledge?

17      A    Not to my knowledge.

18              MR. KOERNER:  Just a follow-up --

19              THE WITNESS:  Another one?

20                      RE REDIRECT EXAMINATION

21      BY MR. HUGH KOERNER, ESQ.:

22      Q    You didn't talk to -- you didn't talk to anybody

23  to find out what happened?

24      A    I did not.

25      Q    You didn't talk to your subordinates so you
```

```
 1   would haven't any knowledge because you didn't engage

 2   yourself in any follow up, correct?

 3       A     Correct, I did not conduct the investigation.

 4       Q     You trust that Deputy Amundson was properly

 5   trained to conduct the sort of investigation that was

 6   necessary and would have people come in to help him if

 7   he needed help, correct?

 8       A     Yes.

 9             MR. KOERNER:  That's all I have.

10             MR. MILLER:  We'll read.

11             COURT REPORTER:  Read.  Okay.

12             (Deposition ended at 11:14 a.m.)

13             (Reading and signing of the deposition by the

14       witness has been reserved.)

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              VERBATIM SUPPORT SERVICES
 2                              12 SE 7TH STREET, SUITE 702
 3                              FORT LAUDERDALE, FL 33301
 4    SEPTEMBER 18, 2018
 5    ATTN:  CAPTAIN ROBERT SCHNAKENBERG
 6    C/O:  DORSEY MILLER, ESQ.
 7    IN RE: DONNIE CHIKEZIE LEUNG TAT V. GARY AMUNDSON, et al
 8                    CASE NO.: 17-62347-Civ-HUNT
 9    Dear Captain Schnakenberg,
10       Please be advised that your deposition taken on August
11    28, 2018, in the case described above has been transcribed
12    and is ready for your review.  Please contact us for an
13    appointment to read and sign this deposition at your
14    earliest convenience.
15       If you do not read and sign the deposition within 30
16    days, the original, which has already been forwarded to
17    the ordering attorney, may be filed with Clerk of the
18    Court.  If you wish to waive your signature, sign your
19    name at the bottom of this letter and return it to us.  If
20    you have any questions regarding this matter, please feel
21    free to contact us at (954) 467-8204.
22    Sincerely,
23    Michelle Nichols
24    Reporter and Notary Public
25        I WAIVE MY SIGNATURE          _____
```

Robert Schnakenberg          August 28, 2018          Page 59

1                         ERRATA SHEET

2    PAGE NO.          LINE NO.

3    _____        _____        _____

4    _____        _____        _____

5    _____        _____        _____

6    _____        _____        _____

7    _____        _____        _____

8    _____        _____        _____

9    _____        _____        _____

10   _____        _____        _____

11   _____        _____        _____

12   _____        _____        _____

13   _____        _____        _____

14   _____        _____        _____

15   _____        _____        _____

16   _____        _____        _____

17   _____        _____        _____

18   _____        _____        _____

19   _____        _____        _____

20   _____        _____        _____

21   _____        _____        _____

22   _____        _____        _____

23   _____        _____        _____

24   _____        _____

25   SIGNATURE                           DATE

Robert Schnakenberg          August 28, 2018                    Page 60

```
 1                    CERTIFICATE OF REPORTER

 2

 3       STATE OF FLORIDA

 4       COUNTY OF BROWARD

 5

 6            I, MICHELLE NICHOLS, do hereby certify that

 7  the foregoing testimony was taken before me; that the

 8  witness was duly sworn by me; and that the foregoing

 9  pages constitute a true record of the testimony given

10  by said witness.

11            I further certify that I am not a relative

12  or employee or attorney or counsel of any of the parties,

13  or a relative or employee of such attorney or counsel,

14  Nor financially interested in the action.

15            Under penalties of perjury, I declare that

16  I have read the foregoing certificate and that the facts

17  stated herein are true.

18            Signed this 28TH day of AUGUST, 2018.

19

20

21       ---------------------------

22       MICHELLE NICHOLS

23

24
```

```
 1                        CERTIFICATE OF OATH

 2

 3        STATE OF FLORIDA

 4        COUNTY OF BROWARD

 5

 6        I, the undersigned authority, certify that

 7  ROBERT SCHNAKENBERG personally appeared before me and was

 8  duly sworn.

 9

10        Witness my hand and official seal this 28TH day

11  of AUGUST, 2018.

12

13

14  _____

15  Michelle Nichols, Court Reporter

16  Notary Public, State of Florida

17  Commission No.:  GG194900

18  Commission Expiration:  March 12, 2022.

19

20

21

22

23

24

25
```

Robert Schnakenberg      August 28, 2018                 Page 62

**-**

**--everybody**
28:5

**1**

**1**
21:25 22:1
41:4,5

**10**
45:12

**10-block**
25:14

**100,000**
29:17,18

**10:10**
5:10

**11:14**
57:12

**12**
13:8

**15**
45:10

**1986**
9:5 10:12

**1991**
9:7 10:12,13

**1999**
9:6

**2**

**20**
17:23 18:2

21:4 22:4
37:23 43:4
45:10,13

**2000**
9:5 10:5,15,16

**2001**
10:5,13,15,17

**2003**
10:20

**2005**
10:21

**2013**
10:8

**2014**
11:19 12:18
14:2 17:16,20,
24 20:13,15,18
32:7 46:21,25
47:7,13,18
48:3

**2018**
5:3,10 47:22

**202**
14:14

**21st**
13:18 14:14

**22**
17:23 18:2

**23**
17:20

**28**
5:3,10

**2nd**
25:12

**4**

**4**
11:19 14:2
20:13,18

**4th**
11:23 12:11
13:4 20:12
25:13,14 29:15

**5**

**50**
25:8

**7**

**75**
11:22 24:23,24
25:8 29:18

**75,000**
25:2 53:6

**8**

**810.09**
34:22

**9**

**90**
29:17

**90,000**
11:22 24:23

**901.17**
31:6,20 32:8,
24 33:2,10

**91.17**
32:5

**9:05**
14:24

**A**

**A-M-U-N-D-**
7:16

**a.m.**
5:10 57:12

**A1a**
13:20

**ability**
31:16 33:20
37:15

**able**
22:5 29:8
40:19 51:2,7,
11

**about**
6:21 9:25
10:13 24:24
25:8,13 26:23
28:2 34:15
40:20 45:11,12
52:11 53:19

**above**
8:2,5 12:23
15:14

**absence**
34:13 39:22
47:17,21

**absent**
38:20 40:3

**absolutely**

9:11 12:13
25:2 38:7 40:6,
8 49:9 53:10,
13,18

**accommodate**
7:8

**across**
41:10

**act**
39:19,23

**action**
5:23 6:4,11
31:17 39:1
40:13 45:22

**activities**
20:5

**actual**
37:14

**actually**
6:16 25:10,17
27:19 28:10

**additional**
27:21

**administering**
36:1

**advise**
34:6 35:19

**advised**
32:4

**advising**
31:11

**affairs**
10:22,24 13:4
18:14

**affidavit**
34:19 56:5

**after**
49:14

**afterwards**
25:25

**AG**
31:13

**again**
6:3 20:19 29:4
33:15 38:24
40:12 49:5
54:25

**against**
41:24

**agent**
35:5

**ago**
51:24

**agree**
35:16 53:9
54:6 55:11,18

**agreed**
9:14

**ahead**
16:5,15 21:24
32:14 35:13
36:15 38:23
39:6 40:5
55:15

**alcohol**
16:8

**all**
7:8 9:25 11:23
12:23 13:5,22,

25 22:4 23:9
25:15 28:17
29:14,15 31:15
37:1,3,8,15
43:3 45:1 53:2
55:24 57:9

**all-day**
13:1,9

**allow**
38:15 40:22

**allowed**
16:19

**along**
13:18,20 15:11
24:25 28:7

**already**
50:17 52:22
53:20 54:13

**also**
25:2 51:19
52:17 53:19
54:10

**Amundson**
5:24 7:16 8:14
19:5,6,17,20,
25 20:7 24:16
25:20,23 26:1,
16,22 27:4,13,
18,24 28:11,
17,22 29:2,5,
22,25 30:4,17,
25 32:3 33:13
34:5 35:25
38:1,4,9,15
41:1,12,16,19
42:2,6,11 43:7,
12,17,22 44:4,
11,19 45:2,4,

15,18 46:3
48:10,18,25
49:5,8,11 50:2,
14,25 51:16,21
53:12,19,21
54:11,17,21,23
55:1 57:4

**Amundson's**
30:21

**Angelo**
8:7

**annual**
17:11,24

**annually**
18:2

**Another**
56:19

**answer**
7:2,3 16:5 31:7

**answered**
55:22

**anybody**
7:11 22:5 25:5
28:22 34:4
55:5 56:10,22

**anyone**
23:7 42:1

**anything**
6:20 18:15
24:19 26:24
27:6 29:6
46:14 48:11,20
49:1,19,22
50:1,25 55:8

**anyway**
54:4

**apply**
6:10,11,24
16:1

**approach**
35:18

**approached**
50:14 51:10
55:2

**appropriate**
33:25 36:5

**approximately**
17:11,14,22
18:3,4

**area**
12:16 13:22
15:6 17:1
19:24 20:12,25
24:14,25
25:14,21 26:9
27:10,22 28:3,
9,11,25 29:3,
19,23 30:11
34:7 36:8
39:12 40:7
41:3 44:23,25
45:5,8 52:16

**arguing**
50:21 52:19

**arm**
38:20 39:5,9,
10,15 54:18

**around**
14:24 20:23
41:6

**arrest**
14:6 31:4,12,
13,14,21,23

32:1,16 34:11
35:23 36:24
37:4 38:11,17,
21 40:4 48:5

**arrested**
31:22 34:17,20
36:9,18 46:2

**arrestee**
30:5

**arresting**
24:1

**arrests**
11:16 14:1

**ascertain**
55:20

**aside**
24:15 49:10

**ask**
24:10 36:22

**asked**
36:16,22 51:5,
9,20 55:22

**asking**
6:19 18:11

**assault**
37:13

**assist**
11:17 25:4,5
46:3

**assistance**
37:20

**assisted**
22:20 45:24

**assisting**

24:20

**Assumes**
32:13 38:22

**assuming**
6:4

**attended**
12:15

**attention**
18:19 22:9
28:3

**attorney/client**
6:18

**August**
5:3,10

**authority**
31:13,22 34:3
35:18,19 36:22
38:9,12

**authorization**
35:5

**authorized**
34:12 35:3,9

**available**
17:8

**Avenue**
13:18 14:15

**aware**
14:1 15:20,24
17:2 18:7,17,
21 23:24 25:20
29:6,22 32:3,
11,22 33:19
35:25 38:14
49:18

**away**

22:9 25:11
30:11 41:10
43:5

---

**B**

**back**
9:13 10:8
12:18 33:18
38:2 41:25
42:3,5,12
44:10 45:19
46:20 48:7,17
49:16

**background**
11:18

**backing**
26:6

**backup**
37:16 38:5
53:20 54:2,8

**backwards**
30:11 44:11

**band**
14:20

**bands**
13:9,11

**barely**
29:16

**Based**
22:23

**basis**
8:20 38:14
39:3

**battery**
46:2

**beach**
7:23 9:5 10:14,
19 11:9,11,21
12:2,4,12
13:17,20 15:8,
15 16:22,23
17:12,16,25
34:3 53:5

**became**
18:17,21 49:18

**becomes**
15:17

**before**
11:7,10 20:10
23:9 31:24
32:5 36:1,5
51:1,10,20

**begin**
51:1

**beginning**
44:24 52:21

**behalf**
5:15,17

**being**
11:4 15:5 18:7
26:8 27:4
31:12,19 32:11
35:20 36:4,21
37:9,12 46:1
48:17,22

**believe**
31:2 40:23
41:3 48:10
51:24

**between**
12:1 17:24
18:2 27:6,12,

17,23 44:3
45:8 48:12
52:19

**bicep**
40:1

**bicycles**
16:8

**big**
13:9

**bigger**
13:6

**bike**
16:11

**bit**
6:14 21:16
26:6

**black**
32:17

**blocked**
30:3 54:12

**blocks**
14:21,22

**board**
10:3

**boardwalk**
15:7,16,21,25
16:2,14,20,24
17:1 18:10,13,
18,22 27:10,
14,19 33:21,24
34:8 35:21
36:5 41:10
42:8 43:24
55:14

**boom**

26:11

**both**
45:17 46:9

**bottom**
21:22 23:8

**brawl**
20:11

**brawls**
20:13

**break**
7:6

**brought**
18:19

**Broward**
5:25 6:1 8:25
9:7 10:7 15:18
17:25 33:19
46:18

**BSO**
56:13

**budget**
8:23 17:11,15

**building**
15:12 16:23
42:20

**bushes**
21:15

**business**
18:15

---

**C**

**call**
37:16 54:3

**calling**
53:19

**calls**
8:23 11:17

**came**
10:8 22:15
28:3 45:20
48:12

**can't**
8:12 13:2
16:11 20:14,15
26:8 29:19
41:7,13 45:7
54:12

**capacity**
12:6

**captain**
6:4,5,6 7:23
8:1,4 9:12
10:22 11:5,13,
16 33:1

**captains**
8:20

**cases**
31:11 32:10

**cause**
31:22

**caused**
23:3,10,13
33:13

**causes**
39:1

**Cedeno**
8:7

**cell**

19:25

**certain**
12:25

**certainly**
23:21

**chain**
23:22

**changed**
47:11

**changes**
46:23

**charge**
7:24 8:22
11:20

**charged**
31:19

**chat**
8:19

**check**
42:16

**chief**
8:25 10:8
15:10

**cigarette**
55:14

**cigarettes**
15:21

**circle**
21:9 41:5
44:25

**circled**
42:19 43:1,3

**circumstance**
40:21 41:9,14

**circumstances**
32:10 34:11
38:16,25
39:15,19 41:20

**city**
7:23 9:5 10:18
11:9,10,21
12:2,4,11,15,
24 15:8,11,12,
14,17 16:1,2,
22,23 17:12,
16,19,24 18:1
34:2,4,12,16
39:11 55:11

**civil**
5:23 6:4,12,24

**clarify**
51:19 52:17

**clear**
21:20 50:13
54:10,16

**client**
14:2 18:8
22:15,17 33:17

**close**
11:22 42:20

**closed**
17:5,9

**Closer**
44:15

**closest**
42:5,7,11,23,
24,25

**colonel**
8:5,8

**color**
29:9 30:7

**come**
13:1 25:4 57:6

**comes**
40:16

**coming**
53:2

**command**
7:19,20,22
23:22

**commander**
11:20

**commands**
43:8 51:10,15

**comment**
52:16

**commission**
12:22

**commit**
39:13

**communicate**
35:6

**communication**
12:10

**company**
15:1

**compel**
39:19

**complete**
46:19 47:1,18,
22

**Complying**

21:8

**concerning**
18:9 27:1

**conduct**
15:24 24:3
57:3,5

**conjunction**
14:5

**considered**
34:6 37:12
48:4,5

**contact**
12:10 43:11
44:8 45:4 50:5
54:21

**contacted**
18:9 41:11
49:20

**container**
34:18

**contemporaries**
9:25

**contract**
17:24

**contractor**
15:13

**control**
16:14 33:16

**conversation**
19:3 52:6,14,
15

**conversations**
51:14

**conveyance**
34:23

**corner**
42:20

**coronel**
8:10

**correct**
12:2 14:15
16:12 18:5,17
19:18 23:6
26:9,12 27:10
28:2 29:8 33:3
36:14 37:17,
20,23 38:5
39:23 40:2,11
41:9,14 42:6,
20 45:21
47:13,17,20,
21,24 48:3
49:3,10,21
50:15,18,23,24
51:3,4,7,8,12,
13,17,18,25
52:2 53:5,22,
23 54:4,14,18,
21,22 57:2,3,7

**couldn't**
20:9 22:10,18
28:24 29:20
30:20 50:21
51:17

**Counsel**
5:13

**County**
5:25 6:1 15:18

**couple**
27:15,17 29:4

**course**
23:19 26:25
32:25 54:5

**court**
5:8,11 56:2
57:11

**covered**
6:18

**create**
40:21

**crime**
39:14

**crimes**
10:16,17

**criminal**
6:11 10:6,13

**CROSS**
50:11

**crowd**
20:11 22:7
25:1 27:20
28:2,5,7,11
33:15 51:6
52:20,22 53:1

**crowded**
26:9

**custody**
22:21,24 30:14
33:17 38:12
44:12

**D**

**daily**
18:14

**danger**
31:18

**dangerous**
53:8

**date**
5:9

**day**
13:5,23

**day-to-day**
8:3,20 11:13

**days**
9:13

**deal**
13:7

**deals**
35:3

**deck**
11:23 18:23
19:14,15 20:25
21:13,21,23
26:7 27:10
53:8

**Deerfield**
7:23 8:1,15,21
9:5,14 10:4,9,
14 11:9,11,21
12:2,4,7,9,12,
15 13:19 15:8,
15 16:22,23
17:12,16,19,25
18:1 34:3
55:12

**Defendants**
5:18

**defender**
6:15,16

**definitely**
41:8

**delay**
39:20,23

**department**
9:15 33:9
55:19

**departments**
12:25

**depending**
24:24 25:9
29:18 38:25
40:12 45:11

**depends**
31:15 34:15
37:1 39:7
46:20

**deposition**
5:1,9,23 6:7,
15,24 7:11
14:12 15:4
52:1 57:12,13

**depositions**
14:11

**deputies**
25:16 31:5
37:19,22

**deputy**
5:25 8:14 19:5,
6,20,25 20:6
24:15 25:20,23
26:1,16,22
27:4,13,18,23
28:11,17,22
29:2,5,22,25
30:4,16,21,24
32:3 33:13

**34:5 35:25
38:1,4,9,15
41:1,11,16,19
42:6,11 43:7,
12,16,22 44:4,
19 45:2,4,14,
18 46:3 48:10,
18,24,25 49:4,
5,7,11,12 50:2,
14,25 51:16,
21,25 52:2
53:11,19,21
54:10,17,23
55:1 57:4**

**describe**
22:12,24 27:16
28:10 48:11,20

**described**
36:21 51:2

**describing**
38:16 41:19

**descriptions**
29:12,20

**detailed**
52:11

**detective**
10:13

**determine**
23:2 33:24

**Dick**
9:11 10:2

**didn't**
22:17 25:19
32:15 49:1
51:25 54:3,20
56:22,25 57:1

**different**
6:14 15:4
38:24 39:15
46:21

**dignitaries**
12:1,11,15

**Digressing**
17:10

**direct**
5:20 20:17
26:16

**directed**
19:5,6,13,16,
21 20:2 26:19
27:4 36:4
51:21

**direction**
19:2 28:6 53:1

**directors**
12:25

**disclose**
6:20

**disclosed**
43:19 49:23
50:3

**discretion**
24:8

**discussion**
27:6 52:11

**dispel**
40:7

**display**
13:5 18:24

**distance**
22:4 42:16

**distant**
42:17

**district**
7:24 8:1,3,15,
22,25 10:14
24:2

**disturbance**
19:1 20:10
21:7 23:3,11,
13,17,25
25:18,22 26:2,
7 27:2,7,23
28:3,4,20
30:17 40:6,10
41:4 52:2,24

**disturbances**
55:21

**diverted**
22:9

**division**
10:6,14

**document**
34:1 47:14

**documented**
47:5

**doesn't**
34:17 47:9

**dogs**
16:8

**dollars**
18:2

**done**
35:16

**Donnie**
5:23 18:8

**don't**
7:5 8:18,19
12:18 13:19
14:4 15:1,19
16:17 19:8
20:19 23:5,7,9,
12 25:3,24
26:3,7,18,19
31:1,16 32:15
33:5 35:1 36:9,
10 39:14 44:21
46:7,8,9,15,25
52:5,10 55:8

**Dorsey**
5:17 50:12
56:9

**down**
13:12 18:24
19:4 20:10,21
25:5,13 26:19
27:19 29:5,14,
15 30:12 42:24
43:2 45:12
53:12 54:2
55:6

**downstairs**
20:2,5 26:16,
22 27:5,9,13,
18,24 30:5,15
43:23 44:11
45:3,16,20,23
48:12 51:21
52:19 53:24

**downtown**
10:7,16

**draw**
21:6

**drew**

21:9

**drove**
46:9

**duly**
5:6 36:13

**during**
13:23 18:24
27:17 43:11

**duties**
38:18

---

E

**each**
30:10 40:19
41:20,22,24,25
43:22 44:4
48:14 50:21
51:2 53:21

**earlier**
24:22 52:1

**easily**
53:15

**east**
13:21 15:16
21:16,19 42:10

**edge**
21:4

**eight-block**
29:18

**either**
7:6 14:6 15:17
19:10 20:6
43:16 50:1

**elevation**

31:15

**else**
24:19 26:20
33:17 34:12
52:17 55:8

**employer**
6:13

**encountered**
41:1

**end**
23:9 43:2

**ended**
57:12

**enforcement**
11:7,10 35:4,
10 36:17

**engage**
40:20 57:1

**engaged**
19:3 30:4,6,13,
17 40:20 43:18
44:21 45:11,15
54:13 55:21

**engaging**
11:14

**enough**
8:14 22:9

**entered**
22:1

**entire**
8:22 16:2
24:25 30:1
33:16

**entrance**
14:19

equal
42:17

equipped
37:19

ESQ
5:21 50:12
55:10 56:9,21

essentially
12:8 45:5,18

even
22:18 24:23
47:21 50:20
54:3

event
11:20,21 13:1,
10 23:18 35:11
47:3

events
12:21 13:22
24:7

ever
10:4 19:25
23:2,7 25:16,
20 29:5 30:21
32:3 33:8,12
34:5 35:25
38:1 43:14
48:23 56:10,13

every
8:23 10:2
11:22 20:14,16
24:4 32:16
36:10 37:1
38:24 46:23

everybody
20:23 52:23

everyone
9:14

everything
8:24 33:17
37:8 44:22

evidence
32:14 38:23

exactly
8:18 13:2 19:8,
23 20:9,15
23:5 31:1
39:21 41:6
44:21 45:7
46:7 52:24

EXAMINATION
5:20 50:11
55:9 56:8,20

example
51:5

except
6:11 31:23

exercise
35:10

exhibit
15:3 21:25
22:1 41:4,5

exigency
39:22 40:11

exigent
39:18 40:21

exit
42:5,7,9,10,11,
14,15,24,25
44:14

experience

11:7,10

explain
23:15 37:2
39:3

explained
50:17

explanation
33:12

extent
28:1

extremely
7:2

eyes
25:3

---

### F

face
40:15

facilitate
38:17

facing
42:1,2 45:18

fact
6:11 33:23
35:8 47:15

facts
32:13 38:22

Fair
8:14

fall
40:11

familiar
13:19 32:1

34:24 35:2,8

far
15:16 20:24
43:2,19 44:19
49:23 50:3

fear
40:7

feasible
24:4

female
19:2 22:12

females
29:10

few
27:23 50:9

fight
40:20,21

fighting
40:15

fights
20:14,16

filming
20:1

find
23:17 56:23

firework
18:24

fireworks
11:19 12:6,16
13:5 14:23,25
20:1 22:6,8
26:11

first
5:6 13:13 15:5

41:2 43:23
50:13 51:10
53:12

fit
39:1

fits
32:17

five
15:10

flashlight
52:4,16

flees
31:23

floor
43:23 49:16

Florida
15:18 31:6
32:23 33:2
34:10,22 35:3,
9

follow
31:6 32:23
57:2

follow-up
56:4,18

follow-ups
50:9

follows
5:6

food
13:8 15:13

football
44:5

force

46:11,17,20
47:1,4,10,14,
19,23,25 48:4,
5,7

**forced**
47:15

**forcibly**
31:23

**form**
15:6 16:5,15
31:7 32:13
33:4 35:13
36:15 38:22
47:6,8,9 55:22

**formulate**
24:9

**Fort**
10:7,21

**four**
14:21,22 42:22

**fourth**
24:22 42:23

**friend**
9:22

**front**
21:11 34:19
37:10 41:6,7,8
42:21

**fully**
32:11

**function**
55:20

**functions**
11:14,25 12:8
23:16

**further**
21:18,19 50:7

**furthest**
13:21

**G**

**Gary**
5:24 7:16
45:24

**gate**
17:3,6

**gather**
52:21

**gave**
51:9

**general**
17:8 19:2,23
28:9 41:3
44:23 45:8

**generally**
6:24 17:4

**getting**
24:21 39:9

**give**
10:10 11:18
28:14 29:9
30:6

**given**
6:7 34:3 38:8

**giving**
31:25

**gladly**
38:6

**globally**

12:20 47:4

**goes**
21:17,18,19
27:24 42:15

**good**
9:15,17,19,21
10:2,4

**gotten**
16:21 38:4

**grab**
38:20 39:4,12,
14,16,25

**grabbed**
32:12 48:25
54:18

**grabbing**
32:9 39:9,10
51:1 53:21

**grade**
8:2

**great**
9:17 11:4

**greatly**
37:5

**ground**
18:10,18,22
45:24 46:1,5,6,
8,9,15,16 48:7,
13,21

**guess**
52:15 54:12

**guided**
48:6

**gun**
39:8

**guy**
10:2 12:7,9
30:14

**guys**
6:20

**H**

**hand**
39:8

**handcuff**
32:9

**handcuffed**
48:9

**handcuffing**
45:25

**handcuffs**
46:12 48:22
49:14

**handle**
26:17

**hands**
11:23 30:10
32:5 33:13
36:2,5 40:22
43:22 44:4
49:5

**happen**
15:2 17:10

**happened**
25:25 27:22
30:22,25 44:22
52:23 54:24
55:2 56:23

**happening**
52:18

**happy**
7:8

**haven't**
57:1

**having**
5:6 22:23
52:10

**head**
12:7,9

**heads**
53:2

**hear**
9:19 18:24
20:22 22:5,10
26:8 43:7,10
51:3,7,11,17
52:25

**heard**
50:1

**help**
30:15 57:6,7

**here**
5:8,14,22 6:11,
12,13,17 17:6
21:3,14,18
29:17 37:7,8
41:6 42:9,10,
14,15,22,23,24
43:19 44:22,23
45:12 49:24

**hey**
39:14 52:13
54:8

**He'll**
56:3

Robert Schnakenberg        August 28, 2018                    Page 70

**he's**
7:3 11:2 19:18
37:9 39:7
40:17,18 49:6
50:20 52:19
54:13 55:5

**hierarchy**
7:25

**hit**
48:23 49:4,12

**holding**
41:20,22

**Holmes**
7:14 10:23
11:24 18:9,19
19:3,10,12,15,
17 20:6 24:15
26:21 27:1,6
46:2 50:2
51:20,25 52:2,
8,9 53:14

**honest**
22:16,18 46:16

**hopefully**
7:5

**huge**
12:25 13:9

**Hugh**
5:15,21,22 6:3
55:10 56:21

**hundred**
29:17

**hundreds**
29:13

**hurt**
40:19

**I**

**imagine**
16:22

**immediately**
39:20,23 53:25

**imperil**
31:25

**incidence**
28:9

**incident**
12:16 13:16
14:9 18:10,12,
18,21 49:19,23

**include**
11:14

**including**
32:24

**incorporate**
47:2

**increased**
37:5

**incumbent**
24:2

**independent**
14:8 23:12

**Independently**
23:4

**indicate**
35:20 38:2

**indicated**
23:10

**indicating**

13:6 21:5,12,
14

**indication**
36:7

**individual**
46:1 48:6 49:6

**individuals**
24:18 25:18,21
50:20

**inform**
31:21,24

**information**
24:12 27:22
29:6 31:25
47:2 48:1

**initial**
23:3,11 54:20,
21

**initially**
33:14 44:21

**injuries**
47:7,8,10,16,
17,22

**insight**
27:21

**instance**
24:4

**instruction**
33:9

**instructs**
7:1

**intended**
33:10

**intent**

32:16 33:5

**intention**
38:21 40:3

**interaction**
22:17

**internal**
10:22,23

**into**
20:11 22:1,21,
24 24:13 30:14
33:17 38:12
44:12 53:15

**introduce**
5:13

**investigate**
19:5,7,13,16,
22 20:10

**investigation**
24:3 55:23
57:3,5

**investigations**
10:6,14

**investigative**
23:16

**involved**
25:18,22 46:13
49:19

**involvement**
49:15

**isn't**
51:25

**Israel**
5:24

**issue**

19:4 34:13
36:6 37:6 43:7
53:3

**itself**
8:3 28:4

**it's**
6:14 8:7,25
9:13,19 11:15,
21,23 12:25
13:1,6,8,9,16,
18,20 17:5,9
23:10,16 24:8
25:12,14
29:13,15,16,19
37:6 39:24
45:12 47:11
48:5 50:8
55:18,25

**I'd**
21:15

**I'll**
23:8

**I'm**
5:11,15,22 6:4,
19 7:23 8:22
9:6 10:15
11:15 15:2,4,5
19:18 21:3,14,
23 26:15 33:11
34:9,22 36:25
37:7 39:8,10,
14 52:4 54:25
56:3

**I've**
8:12 9:8 15:10
22:16

**J**

Jafreda
9:9,11,22

Jim
8:9

Jonathan
50:5

judge
53:1

July
11:19,23 12:11
14:2 20:12,13,
18 24:22

**K**

keep
8:21 25:3

kids
13:9

kind
41:23 46:13

knew
9:25 18:11
30:12

knowledge
16:13 23:2
27:5 33:8 34:5
40:25 48:1
56:13,15,16,17
57:1

Koerner
5:15,21,22 6:3
16:9,18 19:18,
19 21:24 22:3

31:10 32:18
33:7 35:15
36:19 39:2,17
40:9 47:12
50:7 55:10,17,
24 56:3,5,18,
21 57:9

**L**

large
11:21 20:11

later
22:15 37:5

Lauderdale
10:8,21

law
11:7,10 23:20
32:15,23 34:10
35:4,9,20
36:17

lawful
36:14 38:17
48:5

laws
15:24

lawyer
6:12,16 7:10
15:5

least
24:2

leave
10:4 31:2,3
33:23 34:21
35:6,21,22
36:4,8,12,16,
22,23

leaving
29:23

left
8:17 27:13

leg
46:8,13 48:3

legal
38:9 39:3

Leon
43:14 45:5

less
17:20,21 18:5

let
7:7 19:3 23:8

Leung
5:23 14:2,6
18:8 22:15,21,
24 32:4 33:14
34:6 35:16
36:1 38:10,15
40:25 41:10,
15,18 42:3,13
43:10,17,21
44:3,19 45:3,
15,19 46:4,6,
11,17 47:14,25
48:9,13,17,23
49:3,7,10,11,
14 50:2 54:21
55:12

level
18:10,18,22
37:4 46:20

liaison
12:1

lieutenant

8:5 10:20

like
22:18 24:22
25:8,14 29:16
37:17 41:23
43:22 44:4
45:15 46:14,23
51:19 53:7
56:2,6

lineman
44:5 45:15

linemen
41:23 43:23

literally
52:6

little
6:14 18:5
21:16 26:6
30:7 46:21

live
13:9

load
30:3

located
13:23 14:14
19:13,16,21
21:7 25:10
26:2 41:1
42:12

location
14:20

lock-in
9:18

locked
17:3,7 49:2

loitering
34:17

long
7:6 9:2 10:10
20:4 26:1,8
27:12 29:2

looked
18:25 41:23

looking
16:3 19:2
20:21,23 34:22
52:20 53:3

looks
22:18

lot
13:14 22:7
25:5 29:19

loud
19:3 20:22
22:9 26:9
50:17

**M**

made
14:2 32:17
50:22 51:15

main
13:12,13

maintained
45:25

major
7:14 8:4,6,7
10:23 11:24
18:9,19 19:3,
12,15 20:6

Robert Schnakenberg          August 28, 2018                    Page 72

24:15 26:21
27:1,6 46:2
50:2 51:20
52:8,9 53:14

**make**
6:25 11:16
28:8 36:7 37:4
38:11 43:16

**making**
7:3 31:13,20

**male**
19:2 22:14

**males**
29:10

**manager**
12:24

**manipulated**
48:6

**manipulation**
47:11

**manpower**
8:23

**many**
8:20 25:4,7,9,
10 29:17 39:15

**mark**
21:24

**marked**
15:3

**math**
18:6

**matter**
5:14 6:12
18:19 20:8

**may**
32:10 37:2
51:1

**mayor**
12:22,24

**mean**
12:25 23:6,20
34:16,18,25
36:25 37:22
39:12 42:16
52:4,14

**means**
30:9 38:12

**meet**
55:25

**melee**
53:15

**mention**
52:11

**mentioned**
52:2,18

**merged**
9:7

**met**
22:16

**method**
24:11 40:14

**Michelle**
5:11

**might**
6:25 54:7

**mile**
25:11,12

**Miller**

**Miller's**
49:20

**million**
17:13,20 18:2,
5

**mine**
9:22

**minute**
9:6

**minutes**
27:15,17,23
29:4

**misdemeanor**
31:11 32:10

**misspoke**
52:15

**Mm-hmm**
26:13 37:24

**moment**
55:2

**month**
18:5

**more**
17:19 29:9
30:7

**most**
17:9

**move**
27:14

**moved**
45:10

**moving**
28:11,15

**much**
17:22 24:12

---

**N**

**nailed**
17:14

**name**
5:10 6:3

**names**
24:7,21 29:20

**nature**
14:12

**near**
25:10 45:6

**necessary**
57:6

**need**
7:6 9:6 36:8
54:1,8

**needed**
20:10 57:7

**never**
8:12 22:16
49:3,11 54:19

**next**

**10:11 49:18**
52:3 54:13

**nice**
55:25

**Nichols**
5:11

**night**
13:6 53:5
56:11,14

**noise**
22:7 50:23

**noisy**
50:18

**normal**
8:24

**normally**
14:24 24:11

**Northeast**
14:14 25:12,13

**nothing**
28:2 50:7

**numbers**
24:21

---

**O**

**Object**
16:15 32:13
33:4 38:22
47:6 55:15

**objection**
7:4 31:7 39:6
40:5

**objections**
6:25

Robert Schnakenberg          August 28, 2018                    Page 73

**obligated**
32:23

**observations**
43:16

**observe**
19:25 23:20
24:25 25:16
28:7 48:23

**observed**
20:9 22:14
30:18 39:7
41:18 42:12
44:3 45:2 49:7,
11,22 52:4,5

**observer**
12:3

**observing**
40:13 53:7

**obviously**
16:4 27:9
30:12

**occur**
13:4

**occurred**
12:17 20:18
48:11,21

**occurring**
20:5 24:19
28:9 52:25

**off**
22:6 26:11
42:8

**office**
6:1,5,13 7:19,
25 9:1,3,8 10:7
11:8 12:1

**17:25** 23:2
33:20 46:18
49:20

**officer**
9:4 23:16 24:1
31:20,24
35:10,18
36:11,17 37:6,
7,11 39:4,19,
23 40:12,16

**officers**
24:14,25 25:2,
5 28:7 35:4
40:22

**officer's**
31:22

**once**
10:2 20:9
33:16 45:22
52:1 53:24

**one**
13:20 20:15
21:9 23:7,8
42:22,23,24,25
43:1 44:14
55:5 56:19

**only**
8:25 25:25
35:11 36:11

**open**
16:24 17:2,4,8
34:18

**opened**
17:4

**operating**
40:14

**operation**
8:23 24:11
33:16

**operations**
8:4

**opportunity**
31:24 37:2

**opposed**
16:4

**orange**
21:9

**order**
35:6

**ordinances**
15:24 16:1,4
34:16

**Otherwise**
6:23

**over**
10:22 13:25
16:14 18:25
21:9,14,15,18
24:23 25:4,23
44:16,17 53:6

**overhang**
17:3 44:23,24
45:6,8,9,19

**overlook**
15:14 17:7
18:23 21:17

**oversee**
8:24

**overseeing**
33:16

**own**

40:24

**owned**
15:12

**owner**
35:5

**owns**
15:2,5

**o'clock**
13:8

**P**

**pace**
28:14

**paid**
17:19

**palm**
45:9

**paperwork**
14:5,11

**paraphrasing**
31:2

**parking**
13:14

**parks**
12:21

**part**
11:25 23:15
55:19,23

**partners**
12:5

**passed**
11:3

**patrol**

10:11,12 11:14
12:8

**patrons**
20:18 28:8

**pavers**
15:6

**pay**
8:2

**peace**
31:20 39:11

**pen**
21:6

**people**
11:22 12:20,21
19:1 24:23
25:3 29:14,17,
19,20 30:3
31:12 32:8
38:20 39:11,25
40:7,15,20
52:19,20 53:4
55:20 57:6

**perceive**
39:13 55:13

**perceived**
37:14 54:6

**perceiving**
37:16

**perception**
38:25 40:14

**perform**
12:7

**performance**
38:18

**period**

20:4 54:11

**permit**
16:21

**permitted**
35:10

**person**
22:14 30:16
31:21,23,25
35:9,19 36:6,
12,20 37:9
55:11

**personal**
7:7 40:24

**persons**
33:20 34:7,11
35:3

**phone**
20:1 24:21

**phonetic**
9:9

**photograph**
15:3

**physical**
20:17,20

**physically**
19:12 22:20,23
40:25

**pick**
54:7

**picture**
8:11 17:6 21:1

**pier**
13:24 14:14,
16,20 15:12
24:15 25:11

29:14 42:8
50:18

**place**
38:21 40:3
53:12

**placed**
31:12 48:22
49:14

**plaintiff**
5:16 51:5

**Plaintiff's**
21:25

**Plus**
9:22

**point**
27:9 29:7,22
30:2,12 31:18
41:15 43:11
51:3,12

**pointed**
41:4

**Polan**
8:9

**police**
8:24 9:4 23:16
24:7,14 35:18
37:11,19 39:3,
19,22 55:19

**policing**
17:11,15 18:1
55:20

**policy**
24:10 46:19,21

**Pompano**
10:19

**portion**
35:2

**position**
44:9

**possible**
24:12 50:8

**posted**
34:2

**potentially**
53:8,16

**power**
35:10

**practical**
54:7

**practice**
38:19 39:24
41:24

**precipitated**
23:18

**prefacing**
6:19

**prefer**
24:5

**preparation**
7:11 14:12

**prepare**
14:5

**presents**
14:25

**prevent**
33:10 39:12
40:6

**prevented**
24:20

**preventing**
40:10

**principles**
6:23

**prior**
11:7 18:8,11
19:21 20:1,5
26:21 27:2,4
31:13 41:11
43:17 49:1

**privilege**
6:19

**proactive**
11:16

**probably**
20:8 21:4
24:23,24 27:15
30:13 45:11,12

**procedures**
46:19

**professional**
7:7

**prohibition**
15:20

**prohibitions**
15:23

**promoted**
10:15,18,20,21

**properly**
57:4

**property**
15:11,17 34:4,
23 35:6 36:13

**prosecutor**
9:14

**protect**
39:10

**provide**
27:21

**provided**
32:4

**public**
6:15 16:24
17:2,4,8 25:1
34:13,18
35:11,17 36:12
53:17

**punch**
39:9 48:23

**purpose**
32:8 33:2

**pursuant**
36:13 46:18

**push**
41:25

**pushed**
44:13,19 48:17

**pushing**
30:11 44:11
48:14,15

**put**
13:14 24:12
52:3

---

**Q**

**quarter**
10:3

**question**
7:2 50:8

questions
6:19

quick
18:6 56:4,7

quickly
37:3

**R**

radio
38:1,4 54:8

radios
37:19

ran
30:12,14

range
17:23

rank
10:18

re-acquire
45:4

re-acquired
44:7

re-engaged
30:4

read
23:4,9 37:8
56:3 57:10,11

reading
57:13

ready
39:9

really
9:15 22:17

realm
40:11

reason
53:11 54:18

reasonable
24:3 53:16

reasons
7:7

recall
52:10

receive
33:12 35:4

received
33:8

recognize
30:16

recollection
14:8 18:7
23:12 30:24

record
5:14 7:4 8:19
22:2

recorded
33:25

records
24:6

recreations
12:21

RECROSS
56:8

REDIRECT
55:9 56:20

refuse
34:21 36:8,23

refused
31:2,3 36:17

regard
7:8 49:22

Regarding
31:9

regards
15:20

regulate
15:24

related
27:7

relating
27:22

rely
54:23 55:1

remember
12:18 14:4
20:14,19 23:5
26:18,19 27:8
31:1 38:3 46:7,
8,9,15 51:22
52:5

remove
49:15

rented
15:13

report
9:17 23:4
24:13 34:1
46:19 47:1,2,3,
19,23

reported
48:2

reporter

5:8,11 56:2
57:11

reports
23:9,14 24:7,9

represents
6:14,17

request
37:20

requested
38:5

requests
51:15

required
7:3 24:6 31:5
36:12 38:2
46:18,25
47:14,18,22

requirements
31:6 32:4,23

requires
39:22

reserved
57:14

resisting
30:14 31:4
44:12

resists
31:23

respond
11:17

responded
38:6

responding
24:19 25:20

responsibilities
11:13

responsibility
23:17 33:15
55:19

responsible
23:23

restaurants
16:14

reviewed
14:11

Richard
9:22

ride
16:11

rides
13:9

road
10:11,12 11:14
12:8 13:18,20

Robert
5:2,5,9

role
11:15

rude
15:5

rules
6:10,23

run
8:1,4 12:21
15:17 18:2

rundown
10:10

running

8:21 13:5

---

**S**

---

**S-O-N**
7:17

**safety**
25:1 28:7,8
31:17 34:7,14,
18 35:11,17
37:6 53:17

**said**
6:17,18 24:22
25:8,24 26:8
30:25 42:21
51:1,24 52:1,
13 53:4 54:19

**same**
6:10,24 17:16
24:20 26:12
39:6 40:5 44:8
48:15 52:5

**sand**
29:16

**saw**
28:10,24,25
30:4 49:1,3
52:1,12

**say**
7:18 20:8 30:6
45:7 54:8,25
55:16

**saying**
43:25 50:22
51:14,16,17
54:20

**says**

**31:20**

**Schnakenberg**
5:2,5,9

**scope**
55:15

**Scott**
5:24

**screaming**
40:16

**second**
13:13 17:10
20:25 21:13
45:6 46:1
49:16

**seconds**
20:8,21 26:7

**secure**
46:12

**securing**
46:3

**security**
34:7,14

**Seems**
46:23

**seen**
18:13

**sees**
39:1

**sent**
53:11

**separate**
40:17,18 47:1,
8,9

**sergeant**

10:15,18 11:2

**service**
8:24

**services**
18:1

**serving**
11:25

**set**
16:19

**several**
53:4

**sex**
10:16,17

**shadow**
42:14

**shall**
31:21

**shame**
11:4

**sheriff**
5:24 6:1

**sheriff's**
6:1,5,13 7:18,
25 9:1,2,7 10:7
11:8 12:1
17:25 23:2
33:19 46:18

**show**
11:22 12:3,4
15:3,4 21:1

**side**
30:21 42:24,25

**sign**
54:1

**signing**
57:13

**signs**
34:2

**similar**
44:8

**simply**
38:20 39:4,25
54:17

**since**
6:4,15 8:19 9:8

**sir**
5:22 6:2,22
7:13,15,21
8:16 12:18
14:7,13 18:16
20:3 22:6,16
27:25 29:21
30:20 34:9
43:9,13,15,20
44:1,2,18
49:25 50:4,16,
19 55:11 56:1

**sit**
10:3 37:7,8

**situation**
26:17 31:16
37:2 38:24
43:18 45:14
53:7,8,20
54:24

**skateboarding**
16:7

**slap**
55:12 56:10

**slapped**

56:14

**smoke**
55:13

**smoking**
15:21

**social**
18:15

**society**
46:24

**solid**
9:17

**somebody**
8:1 19:11
26:20 33:23
34:12 39:8,10,
13,16

**someone**
36:4 37:12
39:4

**something**
16:3 35:17
51:19 52:12,
13,17

**sometimes**
24:23 25:8
31:16

**somewhere**
21:15

**son**
9:23,24

**sorry**
9:6 10:15
19:18 26:15
54:25 56:3

**sort**

13:6 18:9
33:25 40:11
57:5

**Sounds**
10:4

**south**
13:16 14:22

**Southeast**
13:12,13 25:14

**speak**
23:21 25:17,21
26:21,23 27:1
30:23 31:17
36:11 41:16
43:14 51:25

**speaking**
12:20 23:23
28:22,24,25
47:4

**specific**
16:2,3 37:1

**specifically**
13:23 15:25

**spoke**
20:6 51:20

**spoken**
7:10,11 22:5
43:10

**spread**
24:25

**stage**
13:12,14

**stairs**
20:21

**standing**

14:19 20:24
37:10 45:17
52:3,6

**start**
14:24

**started**
9:4 14:23
23:25 27:14
28:6 31:4

**starting**
52:23

**State**
15:18

**statute**
31:6 32:19
34:22,24,25

**statutes**
33:3 35:3

**step**
51:6

**still**
6:5 7:3,14,16
8:14 45:14,17,
18,19 48:15,17
50:14

**stopped**
33:18

**store**
34:19

**story**
30:22 45:6

**Street**
13:13 25:13,14
29:15

**strike**

48:24 49:4,12
55:12

**structure**
34:23

**Struggling**
41:21

**styled**
5:23

**subject**
35:22 36:23

**subordinates**
23:1 24:3,6
32:20,22 38:19
39:25 47:3
56:25

**such**
35:3,9 37:22

**sudden**
37:9

**suggesting**
39:18 42:19

**supervision**
31:5

**supplement**
47:2

**supposed**
47:5

**surprise**
32:8

**Sutton**
14:3,6 50:5

**sweep**
46:8,13 48:3

**sworn**

5:6

---

**T**

**table**
25:17,21 26:2
28:18,23 29:3,
9,23 30:1
54:11

**tables**
16:19 21:11
28:12 41:6,7,8

**tact**
36:5

**Tak**
22:15,21,24

**take**
7:6 30:13
38:12 39:1
45:22

**takedown**
48:3

**taken**
17:6 22:23
33:17

**takes**
40:13

**taking**
22:21 31:17
45:24 46:5

**talk**
51:6 56:22,25

**talked**
6:20

**talking**

34:15

**Tat**
5:24 14:3,6
18:8 32:4
33:14 34:6
35:16 36:1
38:10,15 40:25
41:10,15,18
42:3,13 43:10,
14,17,22 44:3,
20 45:3,5,15,
19,24 46:1,4,6,
11,17 47:15
48:1,9,13,17,
23 49:3,7,10,
12,14 50:2,13,
20 51:1,10
52:19 53:21
54:14,18 55:2,
13 56:10

**teach**
32:19,21

**tension**
37:6

**terms**
13:4 50:25

**testified**
5:6

**testimony**
6:7 33:1 54:17

**than**
6:14 7:10 14:2,
3 17:20 18:5
28:4 34:23
38:17 46:12,21
48:14,22

**that's**

**8:2 9:22 15:3 16:23 17:2,7 18:20 21:4 24:4 29:16 30:5 32:17 36:10 37:12 41:4 44:12 45:1 51:13 52:14 54:1 55:24 57:9**

**their**
24:7,8,9 25:3 35:19 39:8,9 44:4 53:2

**thereupon**
22:1

**there's**
8:4 11:4 13:5, 8,13 16:1,7 17:6 19:4 20:16 23:17 24:22 26:9 29:13,17 37:5 39:15 40:15 42:9,10,14,15, 22 47:8,16 54:11

**they'll**
35:22

**they're**
16:19 31:12, 18,19 32:11 34:16 35:20 36:21,23 39:13 40:19 41:20,24 45:7,8

**they've**
36:13

**thing**
48:15 52:5

**things**
21:10 36:21

**thousand**
53:4

**threat**
34:6,13 35:11, 17 37:14,16 54:6

**threatened**
37:9,12

**threw**
28:11

**through**
16:21 40:24

**throughout**
25:15

**tickets**
11:16

**time**
5:10 6:8 7:1 11:2 14:23 17:9 18:8 19:13,21 20:1, 4,6 22:6 24:20 26:5,12,22 27:12,17,18 30:1,11 39:1 40:13 41:1,2, 11,18 43:11, 17,21 44:3,7 45:2,3,25 48:12 49:18 51:24 54:11,13 55:25

**today**
5:8,22 6:11 7:6,12 14:12 17:17 23:9 43:19 46:22 48:5 49:24 50:3 55:25

**Today's**
5:9

**together**
10:3

**told**
23:7 31:3,18

**took**
10:22 44:12 46:7,16

**top**
21:21,23

**touch**
38:9,13,15 40:17

**touching**
49:6,7,11

**towards**
21:19 27:14 28:11 44:14 46:11,17 47:14,25

**trained**
57:5

**training**
40:14

**tranquility**
39:11

**transferred**

10:6,16

**transpired**
25:25

**treat**
53:16

**tree**
45:9

**trespass**
33:20,24 34:19,23 36:1, 6,14

**trespassed**
35:20

**trespassing**
34:4,11,20 35:23 36:9,18

**trucks**
13:8

**true**
18:20

**trust**
57:4

**try**
23:17 24:12

**trying**
32:9 39:10 41:24

**turn**
28:6 53:15

**turned**
53:2

**turning**
20:23 52:23

**Twenty-three**

17:13

**two**
18:5 40:15,20 41:23 43:23

**type**
19:1 47:11 51:10

**typical**
20:12

**typically**
6:10 12:20

**U**

**umbrella**
43:2,4

**umbrellas**
42:19,22

**unclear**
30:18

**under**
7:19 31:4,5,12 34:10,11 35:8, 19 38:16,21 40:4 44:23 45:5,7

**understand**
32:7,19 33:2

**understanding**
5:25 11:24 42:18

**unincorporated**
10:21

**unless**
7:1 23:19

36:13 47:7,16

**unlikely**
7:2

**unsafe**
37:3 54:9

**until**
15:17

**upon**
22:23 24:2

**upper**
18:23 19:14,15

**upstairs**
21:4 33:18
49:16 50:14

**use**
21:6 46:11
47:1,4,10,14,
19,22,25 48:4,
5,7

**used**
46:17 47:15

**V**

**Vaguely**
14:10

**vantage**
29:7 30:2 51:3,
12

**vehicles**
8:23

**verbal**
43:7

**verbatim**
5:12 35:1

**versus**
5:24

**view**
20:4 54:12

**violating**
34:16

**violation**
23:20

**violence**
20:17,20 39:12

**visual**
29:25 44:7
45:4

**visualize**
52:18

**voices**
26:9

**W**

**wait**
9:6

**walk**
16:10 38:20
39:4,25

**walked**
41:10 54:17

**walking**
28:16 39:7

**wall**
29:14

**wall-to-**
29:13

**want**

21:20 23:8
40:3 44:25
50:13 52:17
53:19 54:10,16

**wanted**
28:6

**wanting**
55:13

**wants**
50:8

**warn**
33:20 34:3

**warned**
35:21 36:13

**warning**
33:24,25 36:1,
6,14

**warnings**
34:13

**warrant**
31:11,21

**wasn't**
26:5 48:8
52:16

**watch**
26:7 28:17

**watched**
27:20

**watching**
26:5 28:1,5

**water**
21:19 29:15

**way**
21:18 28:17

29:14,15 44:13

**weather**
24:24 29:18

**website**
8:10,12

**welfare**
35:12,18

**went**
10:11,18,20
25:23 26:22
27:18,19 30:5
32:5 33:18
43:25 44:10
48:13 55:6

**weren't**
46:13

**west**
13:15,17

**we'll**
7:7 21:24
57:10

**we're**
5:22 7:5 8:22
12:5 34:15
38:11

**we've**
23:7

**whatever**
20:5 43:4

**what's**
15:13 26:8

**whether**
22:20 23:15
32:3,22 33:19
34:10 37:4

46:25 47:1,3
51:20 53:14

**while**
46:1

**white**
32:17

**whoever**
53:14

**whole**
26:5 53:11

**will**
8:10 31:25
56:7

**wished**
33:23

**within**
37:23 40:11

**without**
31:11,21
39:20,23

**witness**
20:20 21:22
23:19 56:1,19
57:14

**witnessed**
25:25 53:20

**witnesses**
23:21,24 24:7,
21

**witnessing**
53:17

**words**
22:5,10 43:10
52:10

**work**
7:14,16,18
8:15 9:9 10:23

**worked**
10:11,17

**worth**
9:13

**wouldn't**
47:7 51:2,11

**write**
11:16 24:8
29:5 32:15

**writing**
9:17

**written**
33:6 35:4

---

**Y**

---

**yards**
21:4 22:4
37:23 43:5
45:10,12,13

**year**
10:17 11:22
20:14,16 46:23

**years**
15:11

**yelling**
18:24 20:22
40:16 50:21

**young**
9:14

**yourself**
5:13 23:19

24:15 27:6,14
37:22 43:18
49:15 57:2

**you'd**
14:21 37:16
56:6

**you're**
5:25 6:4,5,12
7:3 13:19
15:24 17:1
21:12,16,20
22:23 26:6
29:6,8 31:17
37:4,11,16
38:14,16 39:18
41:19 42:18
50:14 51:16
53:17 54:20

**you've**
6:7 34:12
36:21 42:19
49:23 50:1,17